THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY
THE BANKRUPTCY COURT.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| ------------------------------------------------------------- x | | |
| **In re** | : | |
| | : | |
| **DK AGGREGATES LLC** | : | **Chapter 11 Case No.** |
| | : | **10-51823 (KMS)** |
| **Debtors.** | : | |
| | : | |
| ------------------------------------------------------------- x | | |

**DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF**
**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Robert A. Byrd, Esq.
Byrd & Wiser
Attorneys at Law
145 Main Street
P.O. Box 1939
Biloxi, MS  39533
(228) 432-8123
(228) 432-7029 (fax)
rab@byrdwiser.com
www.byrdwiser.com

Dated: June 3, 2011

# I.

## INTRODUCTION

The Debtor submits this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of equity interests ("Equity Interests") in and Claims against the Debtor in connection with (i) the solicitation of acceptances of the Plan filed by the Debtor with the United States Bankruptcy Court for the Southern District of Mississippi, Southern Division (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for _____, 2011 at __:__ _.m.[1] (prevailing Central Time). Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit A);

- Pro Forma of Operations – 5 year period; Exhibit "B";

- DK Profit and Loss Statement: January 2010 – December, 2010.  Exhibit "C";

- The Schedules and Statement of Financial Affairs – incorporated by reference;

- The Debtor's monthly Operating Reports – incorporated by reference.

A Ballot for the acceptance or rejection of the Plan will be transmitted after Bankruptcy Court approval of the Disclosure Statement and submitted to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.

On _____, 2011, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, will set forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

------

## A.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan.  Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section VI.

Claims in Class 1 (Hancock County Tax Collector), Class 2 (Internal Revenue Service), Class 3 (Mississippi State Tax Commission), Class 4 (Hancock Bank),  Class 6 (Holliday), Class 7 (General Unsecured Claims) and Class 8 (Damage Suit and/or Tort Claimants) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan.  As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

Claims and Equity Interests in Class 9 (Equity) of the Plan are unimpaired.  As a result, holders of Equity Interests in that Class are conclusively presumed to have accepted the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  For a more detailed description of the requirements for confirmation of the Plan, see Section IX of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section IX of this Disclosure Statement.

THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 1-4 and 6-8 VOTE TO ACCEPT THE PLAN.

The Debtor's legal advisor is Byrd & Wiser.  The contact information is as follows:

Robert A. Byrd, Esq.
Byrd & Wiser
Attorneys at Law
145 Main Street
P.O. Box 1939
Biloxi, MS  39533
(228) 432-8123
(228) 432-7029 (fax)

## B.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, a Ballot will be sent for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  Ballots should be returned to:

Robert A. Byrd, Esq.
Byrd & Wiser
Attorneys at Law
145 Main Street
PO Box 1939
Biloxi, MS  39533

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN __:__ **p.m., prevailing Central Time,** _____, 2011.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

C.     **CONFIRMATION HEARING**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2011 at __:__ _.m. (prevailing Central Time) before the Honorable Katherine M. Samson, United States Bankruptcy Court for the Southern District of Mississippi, Southern Division, Dan M. Russell, Jr. United States Courthouse, 2012 15th Street, Gulfport, MS 39501-6209.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before _____, 2011, at __:__ _.m. (prevailing Central Time) in the manner described below in Section VI.F. of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.  HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE IT TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS.

THE DEBTOR URGES CREDITORS TO VOTE TO ACCEPT THE PLAN AND BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERIES FOR THE DEBTOR'S CREDITORS.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH <u>IRS CIRCULAR 230</u>, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, Claims and Equity Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 1 | Hancock County Tax Collector | Impaired.  To be paid in six semi-annual installments of principal and interest at the rate of 12% per annum, commencing on a day that is six (6) months after the Effective Date of the Plan and continuing each six months thereafter until paid in full. | $12,000.00 | 100% |
| 2 | Internal Revenue Service | Impaired.  56 payments in the amount of $1,143.53 per month, commencing January 20, 2011, at 4% per annum interest. Secured Claim.  The Priority Claim of the IRS in the amount of $35,666.71 shall be paid in six (6) semi-annual installments, with interest. | $57,358.98 | 100% |
| 3 | Mississippi State Tax Commission | Impaired.  Six (6) semi-annual installments of principal and interest at the statutory interest claimed by the MSTC, commencing on a day that is six (6)  months after the Effective Date of the Plan and continuing each six months thereafter until paid in full. | $4,633.56 | 100% |
| 4 | Hancock Bank Secured Claim | Impaired.  The secured claim of the Hancock Bank shall be payable pursuant to a twenty (20) year amortization with interest accruing at 6% per | $1,471,500.00 | 100% |

---

[2] The amounts set forth herein are the Debtors' estimates based on the Debtors' books and records and proofs of claims filed to date.  Actual amounts will depend upon the final reconciliation and resolution of all Administrative Expense Claims and Claims.  Accordingly, the actual amounts may vary from the amounts set forth herein.  The Debtor reserves the right to contest any scheduled Claim.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery |
|---|---|---|---|---|
| | | annum, with monthly payments of $10,542.23. Monthly payments shall commence on the 20th of the month immediately following the Effective Date of the Plan. On the 60th month following the Effective Date, the loan will mature and will be due and payable in full. The adequate protection payments presently being made pursuant to Order of the Court dated December 8, 2010, shall cease on the Effective Date. | | |
| 5 | Three Dueces - Kappa | Unimpaired. The monthly payments of $18,000.00 shall be made according to the terms of the original Promissory Note until such time as the balloon payment is due on March 5, 2015. The ultimately allowed secured claim will be determined by the Bankruptcy Court. | $3,000,000.00 (disputed and contingent) | 100% |
| 6 | Holliday | Impaired. The claim of Holliday shall be payable with interest based upon a 6% per annum rate and a twenty (20) year amortization with monthly payments of $6,775.00 commencing on the 10th day of the month next preceeding the Effective Date of the Plan. On the 60th month following the Effective Date, the obligation to Holliday will mature and be payable in full. | $945,750.00 | 100% |
| 7 | Unsecured Creditors Claims | Impaired. Distributions to unsecured creditors shall be made in ten (10) equal payments, first commencing four (4) months after the Effective Date of the Plan, and every six (6) months thereafter, until all claims have been satisfied. | $1,750,000.00 | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 8 | Damage Suit and/or Tort Claimants | Impaired | $0 | Recovery limited to policy limits |
| 9 | Equity Holders | Unimpaired | $0 | 100% |

## III.

## GENERAL INFORMATION

### A.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. The Debtor is submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

### B.    CORPORATE STRUCTURE

1.    Corporate Structure

The Debtor, DK Aggregates LLC , is a Mississippi Limited Liability Company that was formed in 2003. The managing member is Murray J. Moran. The members and their respective interests are as follows: Murray J. Moran – 57.5%; Murray Lucas Moran – 22.5%; Richard Anthony – 10%; and Donald Rafferty – 10%.

2.      <u>Current Officers and Directors</u>

The current managing member of the Debtor is Murray J. Moran.  Murray J. Moran, Luke Moran and Richard Anthony are actively engaged in the operation of the Debtor's business.  Donald J. Rafferty is an inactive ownership member.  The existing management will continue with Murray J. Moran to remain as managing member.

## C.    BACKGROUND

1.      <u>DK Aggregates LLC</u>

DK was formed as a limited liability company pursuant to Mississippi law in 2003.  It was formed for the purpose of acquiring the 1,700 acre tract of land that the Debtor presently owns in Hancock County, Mississippi, for the purpose of engaging in sand and gravel mining operations.  In addition to the existing members, at the time of its formation, Kappa Development and General Contracting, Inc. (Kappa) was also a member.  The Kappa interest was owned by Don Parker, Bobby Allen and Randy Blackledge.

Kappa and its principals wanted to withdraw from the DK venture and on or about July 11, 2006, DK agreed to purchase the Kappa interest for, <u>inter alia</u>, a non-interest bearing promissory note in the original principal amount of $3,900,000.00, which note was secured by a Deed of Trust on the 1,700 acre DK property.  The Note contained a balloon feature maturing in March 2015.

In September 2008, DK entered into a contract for the purchase and sale of the DK property with Mass P. Blackwell, Jr. ("Blackwell") for the aggregate purchase price of $14,000,000.00.  The sale was scheduled to close in sixty (60) days.  A second contract for purchase and sale was signed in November 2008.  Unable to timely close at the request of the buyer on March 10, 2009, DK and Blackwell Aggregates, Inc. and Mass P. Blackwell, Jr., entered into a Management Takeover Agreement which permitted Blackwell to assume operation of the DK premises.  The Agreement further provided for periodic earnest money deposits and an outside closing date of July 20, 2009.

Blackwell did not close and vacated the DK premises in August 2009.  Thereafter, Blackwell filed a pro se lis pendens notice dated August 21, 2009, in the land records of Hancock County, Mississippi.

Upon Blackwell's default, DK assumed possession of its property and set about the task of resuming operations.  The DK premises were not in the same condition as when Blackwell assumed operations, and DK did not have access to conventional financing sources by which it could resume operations.  That led DK to incur debt at above conventional market rates.  DK was also forced to enter into supply contracts at below market rates in order to assist in the resumption of operations and cash flow.

Although unknown to DK at the time, it appears that during August or September 2009, that Blackwell, individually or through his companies or affiliates, started negotiations with Kappa to acquire the Kappa Note and Deed of Trust.  In January 2010, DK was formally advised that Three Dueces, Inc., a Blackwell owned company, was the alleged holder of the Kappa Note and Deed of Trust.

DK resumed operation of its business in January 2010, and has continued the operation of its business until the present time.

2.    Property

DK owns a 1,700 acre parcel of real property located in Hancock County, Mississippi that is bordered on the West by the Pearl River, the dividing line between the states of Mississippi and Louisiana. DK is engaged in the business of sand and gravel mining operations and holds all necessary licenses and permits in order to conduct its business operations. DK had preliminary testing done on 500 acres of the 1,700 acre parcel and DK believes that its property contains substantial reserves of saleable sand and various grades of gravel. DK also owns personal property such as equipment and machinery that is used in DK's mining operations.   Some of DK's equipment is owned by an affiliate, Dirtworks, and is leased to DK.

.

## IV.

## KEY EVENT LEADING TO THE
## COMMENCEMENT OF THE REORGANIZATION CASE

As set forth in Paragraph IIIC(1), supra. after Blackwell defaulted pursuant to the Purchase Contract and Management Takeover Agreement, DK was forced to retake possession and re-commence operation of its business premises. DK continued to make the $18,000.00 per month Kappa note payment until the month of July 2010.

In July 2010, through counsel, Three Dueces, the purported holder of the Kappa Note and Deed of Trust, advised DK that it was declaring default pursuant to the Kappa loan documents and commenced a foreclosure proceeding that was scheduled for August 10, 2010. DK, desiring to protect its business operations and the substantial equity it perceives to hold in its property and business operations, filed its Petition for Relief pursuant to Chapter 11 of the Bankruptcy Code on August 9, 2010.

## V.

## THE REORGANIZATION CASE

A.    PROCEEDINGS

On August 29, 2010, the Debtor filed its Petition for Relief pursuant to the United States Bankruptcy Code. (DK#1). On August 10, 2010, the Debtor filed its Schedules and Statement of Financial Affairs (DK#5), which were subsequently amended October 7, 2010, (DK#35).

The First Meeting of Creditors was held September 27, 2010.

On August 19, 2010, the Court entered its Order authorizing the Debtor to employ Byrd & Wiser as counsel for the Debtor (DK#19), and on September 8, 2010, the Court entered its Order authorizing the Debtor to retain Prichard, Dewberry & Hodges, PC, as accountants for the Debtor.  On September 2, 2010, the Debtor filed its Application to employ Murray Moran, Luke Moran and Richard Anthony as officers and employees of the Debtor (DK#26), and the Court entered its Order approving the Application on October 17, 2010 (DK#42.

9

On August 31, 2010, the Debtor filed an Adversary proceeding against Mass P. Blackwell, Jr., Blackwell Aggregates Inc. and Three Dueces, Inc. seeking damages and alternative relief including but not limited to specific performance. The Debtor incorporates the pleadings in Adversary No. 10-05051 by reference and it contains more detailed information than previously set forth in Section IIIC hereof. Discovery is ongoing in the adversary proceeding.

On October 5, 2010, Hancock Bank filed its Motion to Prohibit or Condition the Use of Cash Collateral. (DK#32). An agreement was reached and an Order was entered relating to Hancock Bank's Motion on November 16, 2010, (DK#76). Prior to the filing of Hancock Bank's Motion, the Debtor had obtained the consent of Hancock Bank to the Debtor's post-petition use of cash collateral.

On October 14, 2010, the Debtor filed its Application to Employ Equity Partners, Inc. (DK#40), in order to assist the Debtor in marketing the Debtor's property and business operations. The Court granted the Debtor's application and authorized the employment of Equity Partners by Order dated December 3, 2010, (DK#90).

On November 3, 2010, the Internal Revenue Service ("IRS") filed its Motion to Prohibit or Condition the Use of Cash Collateral. An agreement was reached and by Order dated December 8, 2010, (DK#95), the Debtor was authorized to continue using cash collateral with the Order further specifying payments to be made by the Debtor to the IRS commencing January 20, 2011.

On November 17, 2010, the Debtor filed its Motion for authority to Sell Property Free and Clear of Liens and to Grant Easements and Right of Ways to Tri-State NGL Pipeline, LLC, which application was granted by Order of this Court dated December 28, 2010 (DK#103).

On December 3, 2010, the Bankruptcy Court entered its Order approving the Debtor's Motion to Employ Equity Partners, Inc. (EPI) to market the Debtor's business for a potential Section 363 sale or joint venture.

Equity Partners, Inc. (EPI) undertook an extremely broad and thorough marketing process on behalf of DK Aggregates, LLC. This process consisted of direct mail/email program, outreach call program, print and internet advertising, and public relations. EPI drafted a direct mail piece and identified the most likely prospects to consider an investment in or acquisition of DK Aggregates based on their Standard Industrial Classification ("SIC") Code and sales volume, or because EPI knew they would have an interest in this type of business. EPI selected 1,699 companies as targets for a mail/email campaign, and 235 companies as targets for our outreach call program. EPI ultimately spoke to 361 groups regarding this opportunity. Print ads were drafted and placed in the *Wall Street Journal* and *Aggregate Manager Magazine.* Internet advertising was placed on *Aggregate Manager Online, propertyline.com, loopnet.com, bizbuysell.com, bizquest.com, Costar, BrokerWorks.com, Dow Jones' MarketWatch, The Wall Street Journal's Startup.wsj.com,* and EPI's website. EPI also drafted a press release that was sent to industry, financial and local publications.

This extensive marketing effort resulted in **73 groups executing confidentiality agreements** and receiving a hard copy of an **information book,** or access to a **virtual data room,** containing information regarding the DK Aggregates opportunity. **Site visits were conducted with 19 groups** at the DK Aggregates facility, with several groups visiting the facility on multiple occasions, employing consultants in the aggregate business to help determine the value of the property and equipment. EPI received four separate offers for stalking horse consideration, none of which were acceptable to DK management, primarily because the offers were insufficient to generate a meaningful dividend for the unsecured creditors.

**B.      CREDITORS' COMMITTEE**

On September 1, 2010, the Office of the U.S. Trustee filed its Notice of Appointment of a Statutory Committee of Unsecured Creditors, pursuant to Section 1102 of the Bankruptcy Code. (DK#25). The Committee was subsequently modified to delete one creditor and add an additional creditor by Notice dated October 8, 2010, (DK#38).

The current members of the Creditors' Committee are:

Retif Oil & Fuel

Central Scales & Controlled Company

Livaudalis Electrical & Construction LLC

Soil Testing Engineering Inc.

Knights Marine & Industrial Services, Inc.

By Order dated November 2, 2010, the Court entered its Order authorizing the Committee to employ Wheeler & Wheeler, PLLC, (DK#59); and in addition thereto the Court approved the Committee's retention of Heller, Draper, Hayden, Patrick & Horn, LLC, as counsel for the Committee, by Order dated November 15, 2010 (DK#74).

Since the appointment of the Creditors' Committee, the Debtor has consulted with the Committee concerning the administration of the chapter 11 case and has informed the Committee with respect to its operations.

**C.      THE SCHEDULES AND BAR DATE**

On August 10, 2010, the Debtor filed its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statement of financial affairs. They were amended October 7, 2010. The Debtor amended its schedules. The Bankruptcy Court entered an order establishing December 7, 2010 as the last date and time (the "Bar Date") for each person or entity to file proofs of Claim based on prepetition Claims against the Debtor.

**D.      REJECTION AND ABANDONMENT OF CERTAIN PROPERTY**

The Debtor is not seeking to reject or abandon any property at this time, but reserves the right to amend this decision prior to confirmation of the Plan.

11

# VI.

## THE PLAN OF REORGANIZATION

### A.    INTRODUCTION

The Debtor believes that (i) because holders of Allowed Claims will receive a 100% recovery under the Plan, creditors will receive a greater recovery from the estate of the Debtor than the recovery that they would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code, and (ii) the Plan will afford the Debtor the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtor's employees.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

### B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND
### EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the

12

Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights.  Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.  Under the Debtors' Plan, the Claims in Classes 1, 2, 3, 4, 6 and 7 are impaired, and therefore, the holders of such Claims are entitled to vote to accept or reject the Plan.

Pursuant to 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan.  Accordingly, their votes are not solicited.  Under the Debtors' Plan, the Claims and Equity Interests in Classes 5 and 8 and are unimpaired, and therefore, the holders of such Claims and Equity Interests are "conclusively presumed" to have voted to accept the Plan.

For a more detailed description of the requirements for confirmation, see Section IX below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization."

Consistent with these requirements, the Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtors into the following Classes:

| Class | Claims |
|-------|--------|
| 1 | Hancock County Tax Collector |
| 2 | Internal Revenue Service |
| 3 | Mississippi State Tax Commission |
| 4 | Hancock Bank |
| 5 | Three Dueces – Kappa |
| 6 | Holliday |
| 7 | Unsecured Creditors |
| 8 | Damage Suit and/or Tort Claimants |
| 9 | Equity Owners |

1.    Unclassified

**Administrative Expense Claims**

Administrative Expense Claims are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtor's estate, actual and necessary costs and expenses of operating the Debtor's business, indebtedness or obligations incurred or assumed by the Debtor in Possession during the Reorganization Case, compensation for professional services rendered and reimbursement of expenses incurred and any fees or charges assessed against the estate of the Debtor under section 1930 of chapter 123 of title 28 of the United States Code.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors will be paid in full and performed by the Debtor or Reorganized Debtor, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

**Professional Compensation and Reimbursement Claims**

Professional Compensation and Reimbursement Claims are all Claims of entities seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code. All such entities must file, on or before the date that is forty-five (45) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred.

Pursuant to the Plan, holders of Allowed Professional Compensation and Reimbursement Claims will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtor is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

At confirmation the Debtor estimates allowed administrative expense claims will total $300,000.00.

2.    Classified

**Class 1 – Hancock County Tax Collector**

Impairment and Voting. Class 1 is impaired and entitled to vote to accept or reject the Debtor's Plan.

Distributions. Except to the extent that the Hancock County Tax Collector agrees to a different treatment, the claim of the Hancock County Tax Collector in the

approximate principal amount of $12,000.00 representing ad valorem property taxes
for 2008 and 2009 shall bear interest at the statutory rate of 12%, per annum, and
shall be paid in six (6) semi-annual installments of principal and interest commencing
on a day that is six (6) months after the Effective Date of the Plan, and continuing
each six months thereafter until paid in full.

### Class 2 - Internal Revenue Service (IRS).

<u>Impairment and Voting</u>.  Class 2 is impaired and entitled to vote to accept or reject
the Plan.

<u>Distributions</u>.  Pursuant to Order of the Bankruptcy Court dated December 8, 2010,
the IRS has an allowed secured claim of $57,358.98.  Pursuant to the Order, the
Debtor will continue making payments commencing January 20, 2011, in the amount
of $1,143.53 per month, which is based upon a fifty six (56) month payment schedule
at 4% per annum interest.

The balance of the IRS claim totaling $35,666.71 is a priority claim and shall bear
interest at the rate of 4%, per annum, and shall be paid in thirty six (36) months in
semi-annual installments of principal and interest commencing on a day that is six (6)
months after the Effective Date of the Plan, and continuing each six months thereafter
until paid in full.

Pursuant to the December 8, 2010 Order the Debtor has reserved all rights to contest
the IRS claims.

### Class 3 - Mississippi State Tax Commission (MSTC).

<u>Impairment and Voting</u>.  Class 3 is impaired under the Plan and is entitled to vote to
accept or reject the Plan.

<u>Distributions</u>.  MSTC has a priority claim in the amount of $4,633.56, which shall be
paid, along with the statutory interest claimed by the MSTC. and shall be paid in six
(6) semi-annual installments of principal and interest commencing on a day that is six
(6) months after the Effective Date of the Plan, and continuing each six months
thereafter until paid in full.

The unsecured claim for the MSTC totaling $454.13 shall be paid pursuant to Class 7.

### Class 4 - Hancock Bank

<u>Impairment and Voting</u>.  Class 4 is impaired under the Plan and is entitled to vote to
accept or reject the Plan.

<u>Distributions</u>.  Hancock Bank is the holder of two (2) claims as to the Debtor, secured
by a first lien position on the Debtor's seventeen hundred (1,700) acres located in
Hancock County, Mississippi, and on certain equipment.  In the aggregate, Hancock
Bank is owed the approximate principal sum of $1,471,500.00.  The secured claim of

the Hancock Bank shall be payable pursuant to a twenty (20) year amortization with interest accruing at 6%, per annum, with monthly payments of $10,542.23. Monthly payments shall commence on the 20th of the month immediately following the Effective Date of the Plan. On the 60th month following the Effective Date the obligation to Hancock Bank will mature and be payable in full. At the Effective Date, the adequate protection payments presently being made pursuant to Order of the Court dated December 8, 2010, shall cease.

Hancock Bank shall retain its liens until paid in full as provided for herein.

### Class 5 - Three Dueces

Impairment and Voting. Class 5 is unimpaired pursuant to Treatment 2 below under the Plan and is not entitled to vote to accept or reject the Plan.

        1.     Class 5 shall receive one of the following three treatments depending upon the ruling of the Court:

        Treatment 1. It is the position of the Debtor that the note due Kappa has an unmatured interest component. To the extent that the outstanding balance due the Class 5 creditor is found by the Court to have an Allowed Secured Claim less than $2,000,000.00, the Class 5 creditor shall receive a monthly payment based upon the following:

        1.     an outstanding balance equal to the Kappa Allowed Secured Claim;

        2.     a simple interest rate of six (6%) percent;

        3.     an amortization of twenty-five (25) years; and

        4.     a balloon payment on the seventh anniversary of the Effective Date.

        Treatment 2. In the event the Court finds that the Allowed Secured Claim of the Class 5 creditor exceeds $2,000,000.00, then the Kappa indebtedness represented by the Note shall be reinstated pursuant to 11 U.S.C. § 1124(2). This treatment shall only be applicable if the Court, pursuant to §§1123 (d) and 1124(2), removes from the Class 5 Allowed Secured Claim all default interest from the date of default until such default is cured, with the Court to determine the cure amount pursuant to Section 1124(2)(C).

        Treatment 3. In the event the Court rules against the Debtor in connection with the applicable conditions for Treatments 1 and 2, the Allowed Secured Claim of Kappa shall receive a monthly payment based upon the following:

        1     an interest rate of six (6%) percent;

        2.     an amortization of twenty-five (25) years; and

        3.     a balloon payment of all unpaid principal and interest on the tenth anniversary of the Effective Date.

To the extent not voided or set aside in the adversary proceeding, or by claim objections, Three Dueces shall retain its lien in an amount to be ultimately determined by the Bankruptcy Court. The Debtor shall be entitled to offset any recovery in the Adversary Proceeding against any allowed claim held by Three Deuces.

### *Class 6 - Holliday*

Impairment and Voting. Class 6 is impaired under the Plan and is entitled to vote to accept or reject the Plan.

Distributions. Holliday shall have an allowed secured claim in the amount of $945,750.00 and shall retain its third lien position as to the Debtor's real property located in Hancock County, Mississippi. The claim of Holliday shall be payable with interest, based upon a 6% per annum rate and a twenty (20) year amortization with monthly payments of $6,775.00 commencing on the 10th day of the month next preceeding the Effective Date of the Plan. On the 60th month following the Effective Date, the obligation to Holliday will mature and be payable in full.

Holliday shall retain its liens until paid in full as provided for herein.

### *Class 7 -  Unsecured Claims.*

Impairment and Voting. Class 7 is impaired under the Plan and is entitled to vote to accept or reject the Plan.

Distributions. Holders of allowed secured claims shall be paid in full. Distributions to unsecured creditors shall be made in ten (10) equal payments, first commencing four (4) months after the Effective Date of the Plan, and every six (6) months thereafter, until all claims have been satisfied. Disputed claims as defined, shall receive no distribution until such time as the claim becomes an allowed claim.

Affiliate and insider claims will receive no distributions until the Plan is fully consummated.

### *Class 8 – Damage Suit and/or Tort Claimants*

1.    Impairment and Voting. Class 8 is impaired and entitled to vote.

Damage suit and tort claimants recovery shall be limited to the extent of available insurance proceeds. Any such claimants shall not be entitled to receive any distribution from the Debtor above or beyond any available insurance proceeds. To the best of the Debtor's knowledge this class is comprised of James M. Kitchens; Christopher Frierson and James M. Smith who have suits pending as to the Debtor in Harrison County, Circuit Court, Second Judicial District, appearing as Case Numbers A2402-2007-84 and A2402-090182 on the docket of the Circuit Court.

*Class 9 - Equity Owners*

Impairment and Voting.  Class 9 is not impaired and is not entitled to vote to accept or reject the Plan.

Distributions.  Premised upon the payment of all allowed claims, in full, the existing equity owners of the Debtor shall retain their respective interests in the Debtor.

## ALTERNATIVE

In October 2010, the Debtor proposed to enter into an Agreement with EP USA, LLC dba Equity Partners, Inc. ("Equity Partners") whereby Equity Partners on an accelerated basis would market and advertise the Debtor's property and business operations in order to locate an acceptable source of re-financing or sale of all or a portion of the Debtor's assets.  The Debtor filed a Motion to Employ Equity Partners October 21, 2010.  After a hearing and over the objection of Three Dueces, on December 3, 2010, the Bankruptcy Court entered its Order authorizing the Debtor to employ Equity Partners.  Equity Partners is now actively marketing the Debtor's assets and business.

Pursuant to this Plan, the Debtor expressly reserves all of its rights to market and sell, by auction or otherwise, all or a portion of its real or personal property through the process of an appropriate Motion pursuant to Section 363 of the Bankruptcy Code.  Should any such sale be approved, the disposition of the net sale proceeds shall be specified and set forth in the Court Order approving any such Section 363 application filed by the Debtor.

## C.   MEANS OF IMPLEMENTING THE PLAN

### 1.   Settlement of Claims

Pursuant to Bankruptcy Rule 9019, the Plan, including the classification, distribution and other benefits provided thereunder, constitutes a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.

## D.   PLAN PROVISIONS GOVERNING DISTRIBUTION

### 1.   Distribution on Account of Allowed Claims

Distributions in respect of Allowed Claims shall be made on the later of the date provided in the Plan and the date a Claim becomes Allowed.  For purposes of treatment and Distribution under the Plan, all Allowed General Unsecured Claims held by a creditor will be aggregated and treated as a single Claim.  At the written request of the Reorganized Debtor, any creditor holding multiple Allowed General Unsecured Claims will provide to the Reorganized Debtor, as the case may be, a single address to which any Distributions shall be sent.

2.    Delivery of Distributions

(a)    Except as otherwise provided herein, all distributions under the Plan will be made by Reorganized Debtor.  Reorganized DK will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as necessary and proper to implement the provisions hereof.

(b)    Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents, as applicable, unless the Debtor or Reorganized Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtor will use commercially reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Reorganized Debtor has determined the then-current address of such holder, at which time such distribution will be made to such holder without interest; provided that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property will be returned by the Reorganized Debtor and will revert to Reorganized DK, and the Claim of any other holder to such property or interest in property will be discharged and forever barred.

(c)    With respect to holders of all General Unsecured Claims against the Debtor, the claims register will be closed on the Distribution Record Date.  The Debtor and the Reorganized Debtor will have no obligation to recognize any transfer of any Claims occurring after the close of business after such date.

3.    Manner of Payment

At the option of the Reorganized Debtor, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

4.    Setoff and Recoupment

The Debtor may, but will not be required to, setoff against or recoup from any Claim any Claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtor or Reorganized Debtor of any such claim it may have against such claimant.

5.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## E.    PROCEDURES FOR TREATING DISPUTED CLAIMS

### 1.    Objections

As of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtor. Such objections and requests for estimation will be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of (i) ninety (90) days after the Effective Date, (ii) ninety (90) days after a proof of Claim has been filed, or (iii) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (i) and (ii) above.

### 2.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or Claim is Disputed, no payment or distribution provided in the Plan shall be made on account of such Administrative Expense Claim or Claim unless and until such Disputed Administrative Expense Claim or Claim becomes Allowed.

### 3.    Distributions After Allowance

To the extent that a Disputed Claim or Disputed Administrative Expense Claim, or a portion of a Disputed Claim ultimately becomes Allowed, distributions (if any) will be made to the holder of such Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Administrative Expense Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Administrative Expense Claim or Claim the distribution (if any) to which such holder is entitled under the Plan.

### 4.    Resolution of Administrative Expense Claims and Claims

On and after the Effective Date, the Reorganized Debtor will have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtor without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals for fees and expenses incurred prior to the Confirmation Date.

### 5.    Estimation of Claims

The Debtor or the Reorganized Debtor may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one

another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## F.    PROVISIONS GOVERNING EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.    Assumption or Rejection of Executory Contracts

The Bankruptcy Code empowers the Debtor to assume or reject its executory contracts and unexpired leases. All executory contracts and unexpired leases that exist between the Debtor and any person or entity will be deemed assumed by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation.

2.    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected by separate Order of the Bankruptcy Court.

3.    Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed, the Debtor will, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the later of (i) the hearing on the Debtor's motion for assumption or assumption and assignment and (ii) the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-Debtor party to such executory contract or unexpired lease to be assumed, the notice, which will list the cure amount as to each executory contract or unexpired lease to be assumed. The parties to such executory contract or unexpired lease to be assumed or assumed and assigned by the Debtor will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtor. If there are any objections filed, the Bankruptcy Court will hold a hearing on a date to be set by the Bankruptcy Court. The Debtor will retain its rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

4.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan

Proofs of claim for damages arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served upon the attorney for the Debtor on or before the date that is thirty (30) days after the later of (i) the date of service of notice of the Confirmation Date, (ii) the date of service of notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such rejection). In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of Claim, will be forever barred and will

21

not be enforceable against the Debtor or the Reorganized Debtor, or its properties or interests in properties as agents, successors or assigns.

     5.     <u>Insurance Policies</u>

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, will be continued.

     6.     <u>Retiree Benefits</u>

The Debtor has no retiree benefit, health care or benefit plans.

## G.     GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

     1.     <u>General</u>

On the Effective Date, the management, control and operation of the Reorganized Debtor will become the general responsibility of the New Board of the Debtor.

     2.     <u>New Boards of the Reorganized Debtor</u>

The directors of the Debtor immediately prior to the Effective Date will serve as the initial directors of the Reorganized Debtor on and after the Effective Date. On the Effective Date, the operation of the Reorganized Debtor will become the general responsibility of its New Board.

     3.     <u>Officers of the Reorganized Debtor</u>

The officers of the Debtor immediately prior to the Effective Date will serve as the officer of the Reorganized Debtor on and after the Effective Date. Such officer will serve in accordance with applicable non-bankruptcy law, any employment agreement entered into with the Reorganized Debtor on or after the Effective Date.

## H.     CONDITIONS PRECEDENT TO EFFECTIVE DATE

     1.     <u>Conditions Precedent to Effectiveness</u>

The Effective Date will not occur and the Plan will not become effective unless and until the following conditions are satisfied in full or waived by the Debtor in the exercise of its business judgment:

     (a)     The Confirmation Order shall have been entered and shall have become a Final Order;

     (b)     All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable; and

     (c)     All authorizations, consents and regulatory approvals, if any, required by the Debtor in connection with the consummation of the Plan are obtained and not revoked.

2.      Waiver of Conditions

Each of the conditions precedent in Section 11.1 of the Plan may be waived, in whole or in part, by the Debtor. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

3.      Satisfaction of Conditions

Any actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously, and no such action will be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions precedent specified in Section 11.1 of the Plan have not occurred or otherwise been waived pursuant to Section 11.2 of the Plan, (i) the Confirmation Order will be vacated, (ii) the Debtor and all holders of Claims and interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (iii) the Debtor's obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

## I.    EFFECT OF CONFIRMATION

1.      Vesting of Assets

On the Effective Date, the Debtor, its properties and interests in property, and its operations will be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estate of the Debtor will vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan. From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Local Rules of Bankruptcy Procedure, subject to the terms and conditions of the Plan.

2.      Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such holder is impaired under the Plan and whether or not such holder is entitled to distribution under the Plan.

3.      Discharge of Claims

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan will discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtor or any of its assets or property to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtor will be, and will be deemed to be, discharged and all holders of such Claims will be precluded and enjoined from asserting against the Reorganized Debtor, its successors or assigns or any of their assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

23

4.     Discharge

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder of a Claim and any Affiliate of such holder will be deemed to have forever waived, released and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor.

5.     **Exculpation**

**Notwithstanding anything in the Plan to the contrary, as of the Effective Date, neither the Debtor, the Reorganized Debtor, the Creditors' Committee, and their respective officers, directors, members, employees, accountants, financial advisors, investment bankers, agents and attorneys and representatives (but, in each case, solely in their capacities as such) will have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Case, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Case, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however*, that the foregoing will not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.**

The Plan does not provide for broad third-party releases, but rather, limited exculpation for acts during this chapter 11 case. The exculpation neither affects liability for prepetition actions nor absolves parties from liability for gross negligence or willful misconduct. The Debtor believes the exculpation provision contained in the Plan is appropriate and reasonable.

6.     **Injunction or Stay**

**Except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against the Debtor or Debtor in Possession will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim against the Reorganized Debtor, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtor with respect to such Claim, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Reorganized Debtor or against the property or interests in property of the Reorganized Debtor with respect to such Claim, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Reorganized Debtor or against the property or interests in property of the Reorganized Debtor with respect to such Claim and (v) pursuing any Claim released pursuant to Article XII of the Plan.**

**Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date will remain in full force and effect until the Effective Date.**

7.    Retention of Avoidance Actions

As of the Effective Date, the Reorganized Debtor will retain any avoidance actions pursuant to sections 544, 547, 548 or 549 of the Bankruptcy Code.

The foregoing descriptions are for informational purposes only and are not an admission by, nor prejudice the rights of, the Debtor and/or the Reorganized Debtor in all respects. Moreover, the descriptions contained herein and in any schedule provided in connection with the Plan are not exclusive. The inclusion or exclusion of any actions herein or on any such schedule is in no way a waiver of any Claim or cause of action whatsoever and all such Claims or causes of action are reserved and preserved. As of the date hereof, no determination has been made as to whether to pursue any such potential claims or causes of action.

## J.    RETENTION OF JURISDICTION

The Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, the following purposes:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, and the allowance of Claims and Administrative Expense Claims resulting therefrom, and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising our of or relating to the Reorganization Case;

(b)    To determine any and all adversary proceedings, applications and contested matters, including but not limited to pending adversary proceedings and claim objections;

(c)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331, and 503(b) of the Bankruptcy Code;

(d)    To hear and determine any timely objections to, or requests for estimation of, Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(e)    To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Equity Interest;

(f)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(g)    To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(h)    To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)    To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(j)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)    To hear and determine all disputes involving the existence, scope, nature or otherwise of the discharges, releases, injunctions and exculpations granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(l)    To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(m)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    To hear and determine any rights, Claims or causes of action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory; including but not limited to any avoidance actions pursuant to Sections 544-549 of the Bankruptcy Code.

(o)    To recover all assets of the Debtor and property of the Debtor's estate, wherever located;

(p)    To enter a final decree closing the Reorganization Cases; and

(q)    To hear any other matter not inconsistent with the Bankruptcy Code.

(r)    To hear and determine any sale application under Section 363 of the Bankruptcy Code filed by the Debtor or Reorganized Debtor as to any of the Debtor's real or personal property and to direct the application and disbursement of any net sale proceeds, whether prior to or after Confirmation of the Plan.

## K.    MISCELLANEOUS PROVISIONS

1.    Effectuating Documents and Further Transactions

The Reorganized Debtor is authorized under the Plan to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

2.    Withholding and Reporting Requirements

Any party issuing any instrument or making any distribution under the Plan will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

3.    Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the members of the Debtor or Reorganized Debtor, including, without limitation, the election or appointment, as the case may be, of members, directors and officers of the Reorganized Debtor pursuant to the Plan and the authorization and approval of the New Management Agreements, if

any, will be in effect from and after the Effective Date pursuant to the applicable general corporation or other organizational law of the states in which the Debtors or the Reorganized Debtor is incorporated, without any requirement of further action by the members of the Debtor or the Reorganized Debtor.

4.    Modification of Plan

        Amendments or modifications of or to the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtor has complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

        Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

5.    Revocation or Withdrawal of the Plan

        The Debtor reserves the right to revoke or withdraw the Plan, in whole or in part, prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan in whole prior to the Confirmation Date, then the Plan will be deemed null and void. In such event, nothing in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

6.    Payment of Statutory Fees

        All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on the Effective Date. The Reorganized Debtor shall continue to file monthly operating reports and pay quarterly fees to the United States Trustee until the bankruptcy case is closed or dismissed.

7.    Post-Confirmation Date Professional Fees and Expenses

        From and after the Confirmation Date, the Reorganized Debtor will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by the Reorganized Debtor.

8.    Dissolution of the Creditors' Committee

        On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Case, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, accountants and other agents, if any, will terminate other than for purposes of filing and prosecuting applications for final allowances of

27

compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

9.      Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan. Any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

10.     Expedited Tax Determination

The Debtors and the Reorganized Debtors are authorized under the Plan to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

11.     Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Mississippi without giving effect to its principles of conflict of laws.

## VII.

## PROJECTIONS AND VALUATION ANALYSIS

**A.      CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS**

1.      Responsibility for and Purpose of the Projections

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtor's management has analyzed the ability of the Debtor to meet its obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business.

2.      Pro Forma Financial Projections

The Debtor believes that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtor or any successor under the Plan.

The Debtor believes its existing cash plus proceeds from operations provide sufficient funds to make all payments required under the Plan. Annexed to the Disclosure Statement as Exhibit B is a Pro Forma Sources and Uses ("Sources and Uses") indicating the sources and uses of cash in connection

with implementation and consummation of the Plan.  The Debtor believes cash flow from operations will enable it to satisfy its future obligations in the ordinary course of its business.

DK does not, as a matter of course, publish its business plans and strategies or projections or its anticipated financial position or results of operations.  Accordingly, DK does not anticipate that it will, and disclaims any obligation to, furnish updated business plans or projections to holders of Claims or Equity Interests after the Confirmation Date.

**THE SOURCES AND USES WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS.  FURTHERMORE, THE SOURCES AND USES HAVE NOT BEEN AUDITED BY INDEPENDENT ACCOUNTANTS.**

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTED SOURCES AND USES ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE PROJECTED SOURCES AND USES. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTOR, ITS ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED RESULTS WILL BE ACHIEVED.  THE PROJECTED SOURCES AND USES WERE NOT PREPARED WITH A VIEW TOWARDS PUBLIC DISCLOSURE OR COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, THE PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING PROJECTIONS OR FORECASTS.  THE PROJECTED SOURCES AND USES HAVE NOT BEEN AUDITED.  IMPAIRED CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE PROJECTED SOURCES AND USES IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The Projected Sources and Uses assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of Reorganized DK, and (iii) except as described herein, there will be no material contingent or unliquidated litigation or indemnity Claims applicable to the Reorganized Debtor.

## VIII.

## CERTAIN FACTORS AFFECTING THE DEBTORS

A.    **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

1.    Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2.    <u>Non-Consensual Confirmation</u>

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. See Section IX below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION - Requirements for Confirmation of the Plan of Reorganization - Requirements of Section 1129(b) of the Bankruptcy Code."

3.    <u>Risk of Non-Occurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

**B.    ADDITIONAL FACTORS TO BE CONSIDERED**

1.    <u>Business Factors</u>

(a)    <u>Operating Conditions</u>. As discussed above, the Debtors believe their existing cash plus proceeds from the operations provide sufficient funds to make all payments required under the Plan.

2.    <u>The Debtor Has No Duty to Update</u>

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.    <u>No Representations Outside This Disclosure Statement Are Authorized</u>

No representations concerning or related to the Debtor, the Reorganization Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

4.    <u>Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary</u>

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

5.    No Legal or Tax Advice is Provided to You By This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each creditor or Equity Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.    No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

7.    Business Factors and Competitive Conditions

(a)    General Economic Conditions. In their financial projections, the Debtor has assumed that the general economic conditions of the United States economy will be stable over the next several years. The stability of economic conditions is subject to many factors outside the Debtor's control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtor. There is no guarantee that economic conditions will improve in the near term.

C.    **CERTAIN TAX MATTERS**

For a summary of certain federal income tax consequences of the Plan to holders of Claims and to the Debtors, see Section XII below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN."

## IX.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

A.    **CONFIRMATION HEARING**[3]

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for _____, 2011. The confirmation hearing may be adjourned from time-to-time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtor's estate or property, the basis for the objection and the

---

[3] Court to set dates.

specific grounds therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon Byrd & Wiser, P.O. Box 1939, Biloxi, MS 39533, Attn:  Robert Alan Byrd, counsel for the Debtor, so as to be received no later than __:__ _.m. (prevailing Central Time) on _____.

Objections to confirmation of the Plan of Reorganization are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION**

1.    Requirements of Section 1129(a) of the Bankruptcy Code

(a)    General Requirements.  At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)    The Debtor has complied with the applicable provisions of the Bankruptcy Code.

(3)    The Plan has been proposed in good faith and not by any means proscribed by law.

(4)    Any payment made or promised by the Debtor or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization Case, or in connection with the Plan and incident to the Reorganization Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)    The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor, or a successor to the Debtor under the Plan of Reorganization, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

(6)    With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

32

(7)     Except to the extent the Plan meets the requirements of section 1129(b)
of the Bankruptcy Code (discussed below), each class of claims or equity
interests has either accepted the Plan or is not impaired under the Plan.

(8)     Except to the extent that the holder of a particular claim has agreed to a
different treatment of such claim, the Plan provides that administrative
expenses and priority claims other than priority tax claims will be paid in
full on the Effective Date and that priority tax claims will receive on
account of such claims deferred cash payments, over a period not
exceeding six years after the date of assessment of such claims, of a
value, as of the Effective Date, equal to the allowed amount of such
claims.

(9)     At least one class of impaired claims has accepted the Plan, determined
without including any acceptance of the Plan by any insider holding a
claim in such class.

(10)    Confirmation of the Plan is not likely to be followed by the liquidation or
the need for further financial reorganization of the Debtor or any
successor to the Debtor under the Plan, unless such liquidation or
reorganization is proposed in the Plan. See discussion of "Feasibility"
below.

(11)    The Plan provides for the continuation after the Effective Date of
payment of all "retiree benefits" (as defined in section 1114 of the
Bankruptcy Code), at the level established pursuant to
subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time
prior to confirmation of the Plan, for the duration of the period the
Debtor has obligated themselves to provide such benefits.

(b)     Best Interests Test. As described above, the Bankruptcy Code requires that each
holder of an impaired claim or equity interest either (i) accepts the Plan or (ii) receives or retains under
the Plan property of a value, as of the Effective Date, that is not less than the value such holder would
receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective
Date.

The first step in meeting this test is to determine the dollar amount that would be
generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7
liquidation case. The gross amount of Cash available would be the sum of the proceeds from the
disposition of the Debtors' assets and the Cash held by the Debtor at the time of the commencement of
the chapter 7 case. The next step, is to reduce that total by the amount of any claims secured by such
assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority
claims that may result from the termination of the Debtor's business and the use of chapter 7 for the
purposes of liquidation. Any remaining net Cash would be allocated to creditors and shareholders in
strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally,
taking into account the time necessary to accomplish the liquidation, the present value of such allocations
may be compared to the value of the property that is proposed to be distributed under the Plan on the
Effective Date.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a
chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals
that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11

33

case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtor both prior to, and during the pendency of, the chapter 11 case.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest. Since holders of Allowed Claims will be paid in full under the Plan, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtor has determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

Moreover, the Debtor believes that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

(c)     Feasibility.  The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its financial obligations as contemplated thereunder. As set forth in Pro Forma Projected Sources and Uses, annexed as Exhibit B, the Debtor believes they will be able to make all payments required to be made pursuant to the Plan.

2.      Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

*No Unfair Discrimination.*  This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

34

*Fair and Equitable Test.* This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- *Secured Claims.* Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- *Claims.* Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- *Equity Interests.* Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

## X.

## FINANCIAL INFORMATION

The Debtor's five (5) year projection of income and expenses is attached hereto and incorporated by reference.

## XI.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

## A.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtor's chapter 11 case may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. Since holders of Allowed Claims will be paid in full, no liquidation analysis is necessary with respect to claims.

Under any scenario and any chapter of the Bankruptcy Code, creditors can never recover more than 100% of their Allowed Claims plus interest. Here, since the Plan provides for such payment, the amount proposed to be paid is not less than the amount creditors would receive under Chapter 7. As a result, no liquidation analysis is necessary with respect to claims. *See generally in re Dow Corning Corp.*, 237 B.R. 380, 412 (Bankr. E.D. Mich. 1999) ("[T]he most that an unsecured creditor is entitled to receive in a chapter 7 proceeding is the value of its claim as of the petition date plus post-petition 'interest

35

at the legal rate.' Once an unsecured claim is paid in accordance with the above formula, it is satisfied and the claimant will have no further recourse against the debtor. Were this not the case, Congress would not have expressly provided for estate proceeds remaining after such distribution to be returned to the debtor. If a chapter 11 plan of reorganization proposes such a distribution scheme, as the Plan does, this aspect of the plan a fortiori satisfies § 1129(a)(7)'s best-interest-of-creditors test.") (internal citation omitted); *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 30 (Bankr. D. Kan. 2001) ("Because the best interest of creditors test only requires that a plan not provide less than what creditors would receive in Chapter 7 liquidation, the instant Plan satisfies § 1129(a)(7). It is impossible for Debtor's creditors to receive more than payment in full with interest in a Chapter 7 liquidation."); *In re Bouy, Hall & Howard & Assocs.*, 141 B.R. 784, 792 (Bankr. S.D. Ga. 1992) ("Since the dissenting creditors will receive 100% of their allowed claims the provisions of Section 1129(a)(7) are satisfied."); *In re Sound Radio, Inc.*, 93 B.R. 849, 854 (Bankr. D.N.J. 1988) (finding it unnecessary to determine exact liquidation value because "[t]he only finding that need be made under an 11 U.S.C. § 1129(a)(7) analysis is that the various interests will get at least as much under the plan as they would in a liquidation. This court must therefore conclude that under either ... plan, creditors would receive as much as they would in liquidation, since they each would get 100 percent of their claim plus interest.").

The Debtor believes that the distribution to equity interest holders under the Plan will be at least as much as such holders would receive in a chapter 7 case. Under chapter 7, a trustee would be appointed to administer the estate, to resolve pending controversies including Disputed Claims, to liquidate the Debtor's assets, and to make distributions to creditors and equity interest holders. A general discussion regarding a hypothetical liquidation of the Debtor's assets under this type of chapter 7 scenario is set forth below.

Conversion to chapter 7 would result in additional administrative expenses, a substantial delay in making distributions to holders of claims, and a reduced distribution to equity interest holders as compared to the anticipated results of confirmation of the Plan. Absent confirmation of the Plan , assets would have to be liquidated for creditors to be paid. A chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in section 326 of the Bankruptcy Code. A chapter 7 trustee might also seek to retain new professionals, including attorneys and accountants, in order to resolve any Disputed Claims and possibly to pursue claims against other parties. The trustee and any such new professionals retained by the trustee would need to spend time familiarizing themselves with the history of the chapter 11 case and the nature of the Debtor's assets and liabilities, which could result in duplication of effort, increased expense and delay in payment to creditors. Under the Federal Rules of Bankruptcy Procedure, a new bar date for the filing of proofs of claim would have to be set, and additional claims against the estates that might now be time-barred (because they were not filed before the applicable Bar Date in the chapter 11 case) could be asserted.

Even if the trustee were authorized to operate the Debtors' business, the trustee would likely not have the required expertise to successfully do so.

Due to the numerous uncertainties and time delays associated with liquidation under chapter 7 of the Bankruptcy Code, it is not possible to predict with certainty the outcome of any chapter 7 liquidation of the Debtor or the timing of any distribution to creditors. However, based on the Plan and the information set forth herein, the Debtor has concluded that equity interest holders will receive at least as much under the Plan as they would receive in a complete liquidation under chapter 7 of the Bankruptcy Code.

**B.    ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan of Reorganization is not confirmed, the Debtor (or if the Debtor's exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to

formulate a different chapter 11 plan of reorganization. Such a plan of reorganization might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of its assets under chapter 11. The Debtor believes that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtor's assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtor believes that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

## XII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are not impaired (e.g., Administrative Expense Claims. In addition, the following summary does not address the federal income tax consequences to holders of Equity Interests.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan.

*Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

## A.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

In general, each holder of an Allowed Secured Claim or General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest,

and other than any post-Effective Date interest and any amount treated as imputed interest as further discussed below) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest).

Holders of an Allowed General Unsecured Claim will receive distributions subsequent to the Effective Date. It is possible that a portion of any gain realized by such holders may be deferred until its full distribution is received.

To the extent that an amount received by a holder of debt is received in satisfaction of a portion of its Claim representing accrued interest, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally will recognize a deductible ordinary loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.

Where gain or loss is recognized by a holder of an Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

## B.    INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

# XIII.

## CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Classes 1, 2, 3, 4, 6, 7 and 8 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than __:__ _.m. (prevailing Central Time) on _____.[4]

**THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE IT TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS. THE DEBTOR URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.**

Dated: *6-3-2011*

Respectfully submitted,

DK AGGREGATES LLC

By: _____
Name: _____
Title: *Managing Member*

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

---------------------------------------------------------------  x
In re                                                            :
                                                                 :
DK AGGREGATES LLC                                                :       Chapter 11 Case No.
                                                                 :       10-51823 (KMS)
        Debtors.                                                 :
                                                                 :
---------------------------------------------------------------  x

**EXHIBIT 'A' TO DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

---------------------------------------------------------------x

In re                                        :
                                             :
**DK AGGREGATES LLC, Debtor**                :            **Chapter 11**
                                             :            **Case No. 10-51823 (KMS)**
                                             :
---------------------------------------------------------------x

## PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

DK Aggregates LLC ("DK" or "Debtor"). proposes the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

**A.    Definitions.**

The following terms used herein shall have the respective meanings set forth below:

1.1    ***Adequate Protection Payments*** shall mean any payments made to a creditor as adequate protection pursuant to Section 361 of the Bankruptcy Code, including but not limited to any Adequate Protection Payments made to the Hancock and the Internal Revenue Service.

1.2    ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of the Reorganization Cases Allowed under and in accordance with, as applicable, sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtor's estate, (b) any actual and necessary costs and expenses of operating the Debtor's businesses, (c) any indebtedness or obligations incurred or assumed by the Debtor in Possession during the Reorganization Case and (d) any compensation for professional services rendered and reimbursement of expenses incurred, including without limitation, any fees or charges assessed against the Estate under section 1930 of chapter 123 of title 28 of the United States Code.

1.3    ***Adversary Proceeding*** – shall mean Case No. 10-05051 pending in the Bankruptcy Court where the Debtor is the Plaintiff in an action filed against Mass P. Blackwell Jr., Blackwell Aggregates, Inc. and Three Deuces, Inc.

1.4    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.5     ***Allowed*** means, with reference to any Claim against the Debtor, (a) any Claim against the Debtor that has been listed by the Debtor in its Schedules (as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim (i) as to which no objection has been or is interposed in accordance with  the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court and as to which any such applicable period of limitation has expired or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order or under Section 7.4 of the Plan; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims."

1.6     ***Allowed Claim*** shall mean a Claim to the extent that it has been Allowed.

1.7     ***Available Cash*** means post-Effective Date cash flow available to the Reorganized Debtor from operations of its business.

1.8     ***Avoidance Claim*** shall mean all rights, claims, causes of action, avoiding powers, suits and proceedings of or brought by or which may be asserted by a debtor in possession or a person under chapter 5 of the Bankruptcy Code, including by way of illustration and not limitation, under Sections 510, 541, 547, 548, 549, 550, 553 and 554 of the Bankruptcy Code, together with any claims, rights, remedies or demands that may be asserted by a creditor or representative of creditors under similar applicable state or other laws, and claims in the nature of substantive consolidation, successor liability, veil piercing, or alter-ego.

1.9     ***Balloon Date*** shall mean the date on which the indebtedness to the Retained Property Classes is due under the Plan.

1.10    ***Ballot*** means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan on which is to be indicated acceptance or rejection of the Plan.

1.11    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Case.

1.12    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of Mississippi or any other court of the United States having jurisdiction over the Reorganization Case.

1.13    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.14  ***Benefit Plans*** means all employee benefit plans, policies and programs sponsored by the Debtor, if any, including, without limitation, all incentive and bonus arrangements, all medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, savings plans, retirement pension plans and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code).

1.15  ***Business Day*** means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.16  ***Cash*** means legal tender of the United States of America.

1.17  ***Causes of Action*** shall mean, without limitation, any and all of the Debtor's and the Estate's actions, causes of action, rights, suits, claims, accounts, debts, sums of money, damages, judgments, claims and demands, actions, defenses, offsets, powers (including all police regulatory, and enforcement powers and actions that may be taken, privileges, licenses, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whatsoever, whether known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or tort, in law, equity or otherwise, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable, accruing to an in favor of the Debtor or Debtor in Possession pursuant to the Bankruptcy Code or any applicable statute or law legal theory.  For avoidance of doubt, Causes of Action include but are in no way limited to (a) rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (b) claims pursuant to Section 362 of the Bankruptcy Code, (c) such claims and defenses as fraud, mistake, duress, and usury, (d) all Avoidance Claims, and € all Causes of Action that are assertable by or may be directly or derivatively asserted by the Debtor, its Estate, the Reorganized Debtor, or a representative of the Estate on behalf of Creditors of the Debtor or the Estate.

1.18  ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.19  ***Collateral*** means any property or interest in property of the estate of the Debtor subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.20  ***Commencement Date*** means August 9, 2010, the date on which the Debtor commenced its Reorganization Case.

1.21  ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.22  ***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.23   ***Confirmation Order*** means the order or orders of the Bankruptcy Court, confirming the Plan.

1.24   ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the Debtor now or hereafter exists or previously existed.

1.25   ***Creditors' Committee*** means the committee of unsecured creditors appointed in the Reorganization Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.26   ***Debtor*** means DK Aggregates LLC.

1.27   ***Debtor in Possession*** means the Debtor in its capacity as debtor in possession in the Reorganization Case under sections 1107(a) and 1108 of the Bankruptcy Code.

1.28   ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.29   ***Disclosure Statement Order*** means the order of the Bankruptcy Court approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.30   ***Disputed*** means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, (b) which has been or hereafter is listed by the Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order or (c) as to which the Debtor or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.  Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the Bankruptcy Court, a Claim shall be considered Disputed to the extent that the amount of the Claim specified in a proof of Claim exceeds the amount of the Claim scheduled by the Debtor as not disputed, contingent or unliquidated (but only to the extent of such excess portion).

1.31   ***Disputed Claim*** shall mean any Claim that Is not an Allowed Claim.  In the event that any portion of a Claim is not an Allowed Claim, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under this Plan until entry of a Final Order fixing and determining the Allowed Amount thereof.  Without limiting any of the foregoing, a Claim that is the subject of or part of a pending objection, motion, complaint, counterclaim, setoff, recoupment, Avoidance Claim, litigation claim or defense, or any other

proceeding seeking to disallow, subordinate or estimate such Claim, shall be deemed a Disputed Claim, unless the Plan or the Confirmation Order expressly provides otherwise.

      1.32    ***Disputed Claim Reserve*** means disputed claims in Class 7 and until such disputed claims are resolved by final Order of the Bankruptcy Court, any distribution from the holder of a disputed claim will be deposited by the Debtor in a segregated account to be held in trust by the Debtor for the benefit of holders of disputed claims. To the extent the Debtor does not contest a portion of a disputed claim, the Debtor may make payment on such undisputed portion.

      1.33    ***Distribution Date*** shall mean each date any payment of Cash or distribution of Assets is due to the holders of Allowed Claims under this Plan.

      1.34    ***Effective Date*** means a Business Day selected by the Debtor on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan specified in Section 10.1 of the Plan shall have been satisfied or waived as provided in Sections 10.2 and 10.3 of the Plan.

      1.35    ***Equity Interest*** means an equity interest in the Debtor existing on or immediately prior to the Effective Date.

      1.36    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

      1.37    ***General Unsecured Claim*** means any against the Debtor other than an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Tax Claim, or Other Secured Claim.

      1.38    ***Hancock Bank means a national bank doing business in Mississippi and the holder of a secured claim as to the Debtor.***

      1.39    ***Holliday means Holliday Construction LLC of Poplarville, Mississippi, holder of a secured claim in this proceeding.***

      1.40    ***IRS means the Internal Revenue Service.***

1.41    ***Impaired*** shall mean, with respect to any Class, that such Class is "impaired" under the Plan within the meaning of Section 1124 of the Bankruptcy Code.

1.42    ***Kappa means  Kappa Development & General Contracting, Inc.***

1.43    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.44    ***Local Bankruptcy Rules*** means the Local Bankruptcy Rules for the Southern District of Mississippi, Southern Division, as amended from time to time.

1.45    ***MSTC means the Mississippi State Tax Commission.***

1.46    ***New Board*** means each board of directors or board of managers appointed pursuant to Section 9.3 of the Plan.

1.47    ***Other Priority Claim*** means a Claim entitled to priority in payment as specified in section 507(a)(1), (a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.48    ***Person*** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.49    ***Plan*** means this Plan of Reorganization, including, without limitation, the exhibits and schedules hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.50    ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.51    ***Ratable Proportion*** means, with reference to any distribution on account of any Allowed Claim in any class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims in such class.

1.52    ***Reorganization Case*** means the case commenced by the Debtor under chapter 11 of the Bankruptcy Code.

1.53    ***Reorganized Debtor*** means the Debtor on and after the Effective Date.

1.54    ***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Reorganization Cases, as have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

1.55    ***Secured Claim*** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the

Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.56    ***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

1.57    ***Three Dueces means Three Dueces, Inc., a Louisiana corporation that claims to hold the original Note, Deed of Trust and Loan Agreement arising by and between the Debtor and Kappa Development & General Contracting, Inc.***

1.58    ***U.S. Trustee*** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of Mississippi.

1.59    ***Unimpaired*** shall mean, with respect to any Class, that such Class is not Impaired.

1.60    ***Unliquidated Claim*** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

1.61    ***Voting Record Date*** means the record date for voting on the Plan as set in the Disclosure Statement Order.

**B.    Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all Section, Article, schedule or exhibit references in the Plan are to the respective Section in, Article of or schedule or exhibit to the Plan, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

**ARTICLE II**

**PROVISIONS FOR PAYMENT OF ADMINISTRATIVE
EXPENSES AND PRIORITY TAX CLAIMS**

2.1    ***Administrative Expense Claims***.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such

Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor in Possession shall be paid in full and performed by the Debtor or Reorganized Debtor, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.2     *Professional Compensation and Reimbursement Claims*.

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is forty-five (45) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtor is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

# ARTICLE III

# [RESERVED]

## ARTICLE IV

## CLASSIFICATION OF CLAIMS AND
## EQUITY INTERESTS, IMPAIRMENT AND VOTING

The following table designates the classes of Claims against and Equity Interests in the Debtors and specifies which of those classes are impaired or unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Hancock County Tax Collector | Impaired | Yes |
| Class 2 | Internal Revenue Service (IRS) | Impaired | Yes |
| Class 3 | Mississippi State Tax Commission (MSTC) | Impaired | Yes |
| Class 4 | Hancock Bank | Impaired | Yes |
| Class 5 | Three Dueces - Kappa | Unimpaired | No |
| Class 6 | Holliday | Impaired | Yes |
| Class 7 | Unsecured Creditors | Impaired | Yes |
| Class 8 | Damage Suit and/or Tort Claimants | Impaired | Yes |
| Class 9 | Equity Holders | Unimpaired | No |

## ARTICLE V

## PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS

5.1    *Hancock County Tax Collector (Class 1)*.

(a)    Impairment and Voting. Class 1 is impaired and entitled to vote to accept or reject the Debtor's Plan.

(b)    Distributions. Except to the extent that the Hancock County Tax Collector agrees to a different treatment, the claim of the Hancock County Tax Collector in the approximate principal amount of $12,000.00 representing ad valorem property taxes for 2008 and 2009 shall bear interest at the statutory rate of 12%, per annum, and shall be paid in six (6) semi-annual installments of principal and interest commencing on a day that is six (6) months after the Effective Date of the Plan, and continuing each six months thereafter until paid in full.

5.2    *Internal Revenue Service (IRS) (Class 2)*.

(a)    Impairment and Voting. Class 2 is impaired and entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Pursuant to Order of the Bankruptcy Court dated December 8, 2010, the IRS has an allowed secured claim of $57,358.98.  Pursuant to the Order, the Debtor will continue making payments commencing January 20, 2011, in the amount of $1,143.53 per month, which is based upon a fifty six (56) month payment schedule at 4% per annum interest.

(c)    The balance of the IRS claim totaling $35,666.71 is a priority claim and shall bear interest at the rate of 4%, per annum, and shall be paid in thirty six (36) months in semi-annual installments of principal and interest commencing on a day that is six (6) months after the Effective Date of the Plan, and continuing each six months thereafter until paid in full

5.3    ***Mississippi State Tax Commission (MSTC) (Class 3)***.

(a)    <u>Impairment and Voting</u>.  Class 3 is impaired under the Plan and is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  MSTC has a priority claim in the amount of $4,633.56, which shall be paid, along with the statutory interest claimed by the MSTC. and shall be paid in six (6) semi-annual installments of principal and interest commencing on a day that is six (6) months after the Effective Date of the Plan, and continuing each six months thereafter until paid in full.

(c)    The unsecured claim for the MSTC totaling $454.13 shall be paid pursuant to Class 7.

5.4    ***Hancock Bank (Class 4)***.

(a)    <u>Impairment and Voting</u>.  Class 4 is impaired under the Plan and is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Hancock Bank is the holder of two (2) claims as to the Debtor, secured by a first lien position on the Debtor's seventeen hundred (1,700) acres located in Hancock County, Mississippi, and on certain equipment.  In the aggregate, Hancock Bank is owed the approximate principal sum of $1,471,500.00.  The secured claim of the Hancock Bank shall be payable pursuant to a twenty (20) year amortization with interest accruing at 6%, per annum, with monthly payments of $10,542.23.  Monthly payments shall commence on the 20th of the month immediately following the Effective Date of the Plan.  On the 60th month following the Effective Date the obligation to Hancock Bank will mature and be payable in full.  At the Effective Date, the adequate protection payments presently being made pursuant to Order of the Court dated December 8, 2010, shall cease.

(c)    Hancock Bank shall retain its liens until paid in full as provided for herein.

5.5    *Three Dueces (Class 5)*.

(a)    <u>Impairment and Voting</u>. Class 5 is unimpaired pursuant to Treatment 2 below under the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Class 5 shall receive one of the following three treatments depending upon the ruling of the Court:

Treatment 1. It is the position of the Debtor that the note due Kappa has an unmatured interest component. To the extent that the outstanding balance due the Class 5 creditor is found by the Court to have an Allowed Secured Claim less than $2,000,000.00, the Class 5 creditor shall receive a monthly payment based upon the following:

1.    an outstanding balance equal to the Kappa Allowed Secured Claim;

2.    a simple interest rate of six (6%) percent;

3.    an amortization of twenty-five (25) years; and

4.    a balloon payment on the seventh anniversary of the Effective Date.

Treatment 2. In the event the Court finds that the Allowed Secured Claim of the Class 5 creditor exceeds $2,000,000.00, then the Kappa indebtedness represented by the Note shall be reinstated pursuant to 11 U.S.C. § 1124(2). This treatment shall only be applicable if the Court, pursuant to §§1123 (d) and 1124(2), removes from the Class 5 Allowed Secured Claim all default interest from the date of default until such default is cured, with the Court to determine the cure amount pursuant to Section 1124(2)(C).

Treatment 3. In the event the Court rules against the Debtor in connection with the applicable conditions for Treatments 1 and 2, the Allowed Secured Claim of Kappa shall receive a monthly payment based upon the following:

1.    an interest rate of six (6%) percent;

2.    an amortization of twenty-five (25) years; and

3.    a balloon payment of all unpaid principal and interest on the tenth anniversary of the Effective Date

(c)    To the extent not voided or set aside in the adversary proceeding, or by claim objections, Three Dueces shall retain its lien in an amount to be ultimately determined by the Bankruptcy Court. The Debtor shall be entitled to offset any recovery in the Adversary Proceeding against any allowed claim held by Three Deuces.

5.6    *Holliday (Class 6)*

(a)    <u>Impairment and Voting</u>. Class 6 is impaired under the Plan and is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Holliday shall have an allowed secured claim in the amount of $945,750.00 and shall retain its third lien position as to the Debtor's real property located in Hancock County, Mississippi.  The claim of Holliday shall be payable with interest, based upon a 6% per annum rate and a twenty (20) year amortization with monthly payments of $6,775.00 commencing on the 10th day of the month next preceeding the Effective Date of the Plan.  On the 60th month following the Effective Date, the obligation to Holliday will mature and be payable in full.

(c )    Holliday shall retain its liens until paid in full as provided for herein.

## 5.7    *Unsecured Claims (Class 7)*.

(a)    Impairment and Voting.  Class 7 is impaired under the Plan and is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Holders of allowed secured claims shall be paid in full.  Distributions to unsecured creditors shall be made in ten (10) equal payments, first commencing four (4) months after the Effective Date of the Plan, and every six (6) months thereafter, until all claims have been satisfied.  Disputed claims as defined, shall receive no distribution until such time as the claim becomes an allowed claim.

(c )    Affiliate and insider claims will receive no distributions until the Plan is fully consummated.

(d)    The unsecured claims, to the extent allowed, will be treated as Class 7 claims.

## 5.8    *Damage Suit and/or Tort Claimants (Class 8)*.

(a)    Impairment and Voting.  Class 8 is impaired and entitled to vote.

(b)    Damage suit and tort claimants recovery shall be limited to the extent of available insurance proceeds.  Any such claimants shall not be entitled to receive any distribution from the Debtor above or beyond any available insurance proceeds.  To the best of the Debtor's knowledge this class is comprised of James M. Kitchens; Christopher Frierson and James M. Smith who have suits pending as to the Debtor in Harrison County, Circuit Court, Second Judicial District, appearing as Case Numbers A2402-2007-84 and A2402-090182 on the docket of the Circuit Court.

## 5.9    *Equity Owners  (Class 9)*.

(a)    Impairment and Voting.  Class 9 is not impaired and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Premised upon the payment of all allowed claims, in full, the existing equity owners of the Debtor shall retain their respective interests in the Debtor.

**ALTERNATIVE.**    In October 2010, the Debtor proposed to enter into an Agreement with EP USA, LLC dba Equity Partners, Inc. ("Equity Partners") whereby Equity Partners on an accelerated basis would market and advertise the Debtor's property and business operations in order to locate an acceptable source of re-financing or sale of all or a portion of the Debtor's assets. The Debtor filed a Motion to Employ Equity Partners October 21, 2010. After a hearing and over the objection of Three Dueces, on December 3, 2010, the Bankruptcy Court entered its Order authorizing the Debtor to employ Equity Partners. Equity Partners is now actively marketing the Debtor's assets and business.

Pursuant to this Plan, the Debtor expressly reserves all of its rights to market and sell all or a portion of its real or personal property through the process of an appropriate Motion pursuant to Section 363 of the Bankruptcy Code. Should any such sale be approved, the disposition of the net sale proceeds shall be specified and set forth in the Court Order approving any such Section 363 application filed by the Debtor.

## ARTICLE VI

## MEANS OF IMPLEMENTATION

6.1    *Settlement of Claims*.

Pursuant to Bankruptcy Rule 9019, in consideration for the classification, distribution and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.

## ARTICLE VII

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

7.1    *Voting of Claims*.

Each holder of an Allowed Claim in an impaired class of Claims as of the Voting Record Date that is entitled to vote on the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the Disclosure Statement Order.

7.2    *Nonconsensual Confirmation*.

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserves the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

7.3    *Distributions on Account of Allowed Claims.*

Distributions in respect of Allowed Claims shall be made on the later of the date provided in Article IV and the date a Claim becomes Allowed. All Allowed Claims in a particular class held by a creditor shall be aggregated and treated as a single Claim. At the written request of the Reorganized Debtor any creditor holding multiple Allowed Claims shall provide to the Reorganized Debtor as the case may be, a single address to which any distributions shall be sent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

7.4    *Delivery of Distributions.*

(a)    Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtor. Reorganized Debtor shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Reorganized Debtor shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as necessary and proper to implement the provisions hereof.

(b)    Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents, as applicable, unless the Debtor or Reorganized Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtor shall use commercially reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Reorganized Debtor has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property shall be returned by the Reorganized Debtor to the Reorganized Debtor and shall revert to Reorganized Debtor, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

(c)    With respect to holders of all General Unsecured Claims against the Debtor, the claims register shall be closed on the Distribution Record Date. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims occurring after the close of business after such date.

7.5    *Manner of Payment*.

At the option of the Reorganized Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

All distributions of Cash to the creditors of the Debtor under the Plan shall be made by, or on behalf of, the Debtor.

7.6    *Setoffs and Recoupment*.

The Debtor may, but shall not be required to, setoff against or recoup from any Claim any Claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized Debtor of any such Claim it may have against such claimant.

7.7    *Allocation of Plan Distributions Between Principal and Interest*.

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## ARTICLE VIII

## PROCEDURES FOR TREATING DISPUTED
## CLAIMS UNDER PLAN OF REORGANIZATION

8.1    *Objections*.

As of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtor may be interposed and prosecuted only by the Reorganized Debtor. Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of (a) ninety (90) days after the Effective Date, (b) ninety (90) days after a proof of Claim has been filed in the Reorganization Cases or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above.

8.2    *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Administrative Expense Claim or Claim unless and until such Disputed Administrative Expense Claim or Claim becomes Allowed.

8.3    *Distributions After Allowance*.

To the extent that a Disputed Claim or Disputed Administrative Expense Claim becomes Allowed, distributions (if any) shall be made to the holder of such Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Disputed Administrative Expense Claim becomes a Final Order, the Reorganized Debtor shall provide to the holder of such Administrative Expense Claim or Claim the distribution (if any) to which such holder is entitled under the Plan.

8.4    *Resolution of Administrative Expense Claims and Claims*.

On and after the Effective Date, the Reorganized Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtor and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtor without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals for fees and expenses incurred prior to the Confirmation Date.

8.5    *Estimation of Claims.*

The Debtor or the Reorganized Debtor may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## ARTICLE IX

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1    *Assumption or Rejection of Executory Contracts and Unexpired Leases*.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any person or entity prior to the Commencement Date shall be deemed assumed by the Debtor as of the Effective Date, except

for any executory contract or unexpired lease (a) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, or (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date.

9.2     ***Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases***.

      Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed under the Plan.

9.3     ***Cure of Defaults***.

      To the best of the Debtor's knowledge and information, all scheduled leases and executory contracts are month to month, and are deemed current as of the Effective Date.

9.4     ***Insurance Policies***.

      Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtor's insurance policies and any agreements, documents or instruments relating thereto, shall be continued.  Nothing contained in this Section shall constitute or be deemed a waiver of any cause of action that the Debtor may hold against any entity, including, without limitation, the insurer, under any of the Debtor's policies of insurance.

9.5     ***Retiree Benefits and Benefit Plans***.

      The Debtor has no retirement plans or benefit Plans in place.

# ARTICLE X

# GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

10.1    ***General***.

      On the Effective Date, the management, control and operation of the Reorganized Debtor shall become the general responsibility of the new board of the Reorganized Debtor.

10.2    ***Amended Organizational Documents***.

The Reorganized Debtor shall be deemed to have adopted its respective Amended Organizational Documents, if any, effective as of the Effective Date.

10.3    *New Board of the Reorganized Debtor*.

The directors and managers of the Debtor immediately prior to the Effective Date shall serve as the initial directors and managers of the Reorganized Debtor on and after the Effective Date.

10.4    *Officers of the Reorganized Debtor*.

The officers of the Debtor immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtor on and after the Effective Date.  Such officers shall serve in accordance with applicable non-bankruptcy law, and any employment agreement entered into with the Reorganized Debtor on or after the Effective Date.

.

# ARTICLE XI

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

11.1    *Conditions Precedent to Effectiveness*.

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 10.2 or 10.3 of the Plan:

(a)    The Confirmation Order shall have been entered and shall have become a Final Order; and

(b)    All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable.

11.2    *Waiver of Conditions*.

Each of the conditions precedent in Section 10.1 hereof may be waived, in whole or in part, by the Debtor.  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

11.3    *Satisfaction of Conditions*.

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the

conditions specified in Section 10.1 of the Plan have not occurred or otherwise been waived pursuant to Section 10.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtor and all holders of Claims and interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtor's obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

## ARTICLE XII

## EFFECT OF CONFIRMATION

12.1    *Vesting of Assets*.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtor, its properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan. From and after the Effective Date, the Reorganized Debtor may operate the business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

12.2    *Binding Effect*.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests are impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

12.3    *Discharge of Claims*.

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtor or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtor shall be, and shall be deemed to be, discharged, and all holders of such Claims shall be precluded and enjoined from asserting against the Reorganized Debtor, their successors or assignees or any of their assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

12.4    *Discharge*.

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor.

12.5    *Injunction or Stay.*

**Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against the Debtor or the Debtor in Possession are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim against the Reorganized Debtor, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim, (c) creating, perfecting or enforcing any encumbrance of any kind against the Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim and (e) pursuing any claim released pursuant to this Article XI of the Plan.**

12.6    *Terms of Injunction or Stay.*

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.

12.7    *Exculpation.*

**Notwithstanding anything herein to the contrary, as of the Effective Date, neither the Debtor, the Reorganized Debtor,  and the Creditors' Committee and their respective officers, directors, members, employees, accountants, financial advisors, investment bankers, agents, and attorneys and representatives (but, in each case, solely in their capacities as such) shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however,* that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.**

**Nothing in this Section 12.7 shall limit the liability of the professionals of the Debtor, the Reorganized Debtor and the Creditors' Committee, and their respective officers, directors, members, employees, accountants, financial advisors, investment bankers, agents and attorneys and representatives to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.**

12.8    *Retention of Avoidance Actions*.

As of the Effective Date, the Reorganized Debtor shall retain any avoidance actions pursuant to sections 544, 547, 548 or 549 of the Bankruptcy Code.

## ARTICLE XIII

## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims and Administrative Expense Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Reorganization Cases;

(b)    To determine any and all adversary proceedings, applications and contested matters, whether filed prior to or after the Effective Date;

(c)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part and otherwise resolve disputes as to Administrative Expense Claims;

(e)    To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Equity Interest;

(f)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(g)    To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(h)    To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)      To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(j)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtor prior to the Effective Date or by the Reorganized Debtor, after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(k)      To hear and determine all disputes involving the existence, scope, nature or otherwise of the discharges, releases, injunctions and exculpations granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(l)      To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(m)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      To hear and determine any rights, Claims or causes of action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(o)      To recover all assets of the Debtor and property of the Debtor's estates, wherever located;

(p)      To enter a final decree closing the Reorganization Cases; and

(q)      To hear any other matter not inconsistent with the Bankruptcy Code.

(r)      To hear and determine any sale application under Section 363 of the Bankruptcy Code filed by the Debtor or Reorganized Debtor as to any of the Debtor's real or personal property and to direct the application and disbursement of any net sale proceeds, whether prior to or after Confirmation of the Plan.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

14.1    *Modification of Plan*.

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtor shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

## 14.2    *Revocation or Withdrawal of the Plan.*

The Debtor reserves the right to revoke or withdraw the Plan, in whole or in part, prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan in whole prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

## 14.3    *Payment of Statutory Fees.*

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

## 14.4    *Post-Confirmation Date Professional Fees and Expenses.*

From and after the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by the Reorganized Debtor.

## 14.5    *Dissolution of the Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Case, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate other than for purposes of filing and

prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

14.6   ***Expedited Tax Determination.***

The Debtor and the Reorganized Debtor are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtor for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

14.7   ***Exhibits/Schedules.***

Any exhibits and schedules to the Disclosure Statement or the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

14.8   ***Substantial Consummation.***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

14.9   ***Severability of Plan Provisions.***

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

14.10   ***Governing Law.***

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Mississippi without giving effect to its principles of conflict of laws.

14.11  *Notices*.

All notices, requests and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to DK, addressed to:

DK Aggregates LLC
15047 Big John Road
Biloxi, MS  39532


With a copy to:

Byrd & Wiser
P.O. Box 1939
Biloxi, MS 39533
Attn:  Robert Alan Byrd
Telecopy No.:   (228) 432-7029
Telephone No.:  (228) 432-8123

Dated: 6-3_____, 2011.

Respectfully submitted,

DK AGGREGATES LLC



By: *Murray Moor Managing Member*
Name:
Title:  Managing Member

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

------------------------------------------------------------- x

In re                                                    :

                                                         :

DK AGGREGATES LLC                                        :        Chapter 11 Case No.

                                                         :        10-51823 (KMS)

          Debtors.                                       :

                                                         :

------------------------------------------------------------- x

**EXHIBIT 'B' TO DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

# DK Aggregates, LLC
## Cash Flow Budget Worksheet
### Six Months Ended December 31, 2011

| | #1 | #2 | #3 | #4 | #5 | #6 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 0 | $80,107 | $299,463 | $383,820 | $363,926 | $225,466 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 135,000 | 0 | 0 | 0 | 0 | 135,000 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $360,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,485,000 |
| **Available Cash Balance** | $225,000 | $440,107 | $524,463 | $608,820 | $588,926 | $450,466 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 90,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 54,000 |
| Other:UST Fees | 4,250 | 0 | 0 | 4,250 | 0 | 0 | 8,500 |
| | | | | | | | 0 |
| **Subtotal** | $131,250 | $127,000 | $127,000 | $131,250 | $127,000 | $127,000 | $770,500 |
| **Other Cash Out Flows:** | | | | | | | |
| Admin Fee | 0 | 0 | 0 | 100,000 | 200,000 | 0 | 300,000 |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 13,643 | 13,644 | 13,644 | 13,644 | 36,461 | 36,461 | 251,370 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 250,000 | 250,000 |
| **Subtotal** | $13,643 | $13,644 | $13,644 | $113,644 | $236,461 | $286,461 | $501,370 |
| **Total Cash Outflows** | $144,893 | $140,644 | $140,644 | $244,894 | $363,461 | $413,461 | $1,271,870 |
| **Ending Cash Balance** | $80,107 | $299,463 | $383,820 | $363,926 | $225,466 | $37,005 | |

| Class | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | | | $0.00 |
| 2 Monthly | $1,143.00 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,860.65 |
| 2 Semi Annual | | | | | | | $0.00 |
| 3 Semi Annual | | | | | | | $0.00 |
| 4 Monthly | $12,500.00 | $12,500.00 | $12,500.00 | $12,500.00 | 10542.23 | 10542.23 | $71,084.46 |
| 5 Monthly | # | # | # | # | $18,000.00 | $18,000.00 | $126,000.00 |
| 6 Monthly | # | # | # | # | $6,775.00 | $6,775.00 | $47,425.00 |
| 7 Semi Annual | | | | | | | $0.00 |
| 8 | | | | | | | 0 |
| Totals | 13643 | $13,643.53 | $13,643.53 | $13,643.53 | $36,460.76 | $36,460.76 | $251,370.11 |

## DK Aggregates, LLC
## Cash Flow Budget Worksheet
## Six Months Ended June 30, 2012

| | #7 | #8 | #9 | #10 | #11 | #12 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 37,005 | $104,294 | $175,833 | $72,373 | $139,662 | $202,852 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| **Available Cash Balance** | $262,005 | $329,294 | $400,833 | $297,373 | $364,662 | $427,852 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 54,000 |
| Other:UST Fees | 4,250 | 0 | 0 | 4,250 | 0 | 0 | 8,500 |
| | | | | | | | 0 |
| **Subtotal** | $121,250 | $117,000 | $117,000 | $121,250 | $117,000 | $117,000 | $710,500 |
| **Other Cash Out Flows:** | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 36,461 | 36,461 | 211,461 | 36,461 | 44,810 | 36,461 | 497,523 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | $36,461 | $36,461 | $211,461 | $36,461 | $44,810 | $36,461 | $497,523 |
| **Total Cash Outflows** | $157,711 | $153,461 | $328,461 | $157,711 | $161,810 | $153,461 | $1,208,023 |
| **Ending Cash Balance** | $104,294 | $175,833 | $72,373 | $139,662 | $202,852 | $274,392 | |

Class

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | $2,107.86 | | $2,107.86 |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 |
| 2 Semi Annual | | | | | 5468.7 | | $5,468.70 |
| 3 Semi Annual | | | | | $772.26 | | $772.26 |
| 4 Monthly | $10,542.23 | $10,542.23 | $10,542.23 | $10,542.23 # | $10,542.23 # | $10,542.23 | $84,337.84 |
| 5 Monthly | $18,000.00 # | $18,000.00 # | $18,000.00 # | $18,000.00 | $18,000.00 | $18,000.00 | $162,000.00 |
| 6 Monthly | $6,775.00 # | $6,775.00 # | $6,775.00 # | $6,775.00 | $6,775.00 | $6,775.00 | $60,975.00 |
| 7 Semi Annual | | | $175,000.00 | | $6,775.00 | | $175,000.00 |
| 8 | | | | | | | 0 |
| Totals | $36,460.76 | $36,460.76 | $211,460.76 | $36,460.76 | $44,809.58 | $36,460.76 | $497,522.84 |

## DK Aggregates, LLC
## Cash Flow Budget Worksheet
## Six Months Ended December 31, 2012

| | #13 | #14 | #15 | #16 | #17 | #18 | Total |
|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | 274,392 | $350,681 | $431,220 | $336,759 | $417,298 | $489,489 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| **Available Cash Balance** | $499,392 | $575,681 | $656,220 | $561,759 | $642,298 | $714,489 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other:UST Fees | 4,250 | 0 | 0 | 0 | 0 | 0 | 4,250 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Subtotal** | $112,250 | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $652,250 |
| **Other Cash Out Flows:** | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 36,461 | 36,461 | 211,461 | 36,461 | 44,810 | 36,461 | 454,825 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | $36,461 | $36,461 | $211,461 | $36,461 | $44,810 | $36,461 | $454,825 |
| **Total Cash Outflows** | $148,711 | $144,461 | $319,461 | $144,461 | $152,810 | $144,461 | $1,107,075 |
| **Ending Cash Balance** | $350,681 | $431,220 | $336,759 | $417,298 | $489,489 | $570,028 | |

| Class | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | $2,107.86 | | $2,107.86 |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 |
| 2 Semi Annual | | | | | 5468.7 | | $5,468.70 |
| 3 Semi Annual | | | | | $772.26 | | $772.26 |
| 4 Monthly | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 | $115,964.53 |
| 5 Monthly | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $108,000.00 |
| 6 Monthly | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $40,650.00 |
| 7 Semi Annual | | | $175,000.00 | | | | $175,000.00 |
| 8 | | | | | | | 0 |
| Totals | $36,460.76 | $36,460.76 | $211,460.76 | $36,460.76 | $44,809.58 | $36,460.76 | $454,824.53 |

Page 3

## DK Aggregates, LLC
## Cash Flow Budget Worksheet
### Six Months Ended June 30, 2013

| | #19 | #20 | #21 | #22 | #23 | #24 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 570,028 | $650,567 | $731,107 | $636,646 | $717,185 | $789,376 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| **Available Cash Balance** | $795,028 | $875,567 | $956,107 | $861,646 | $942,185 | $1,014,376 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other:UST Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Subtotal** | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $648,000 |
| **Other Cash Out Flows:** | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 36,461 | 36,461 | 211,461 | 36,461 | 44,810 | 36,461 | 454,825 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| **Subtotal** | $36,461 | $36,461 | $211,461 | $36,461 | $44,810 | $36,461 | $454,825 |
| **Total Cash Outflows** | $144,461 | $144,461 | $319,461 | $144,461 | $152,810 | $144,461 | $1,102,825 |
| **Ending Cash Balance** | $650,567 | $731,107 | $636,646 | $717,185 | $789,376 | $869,915 | |

| Class | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | $2,107.86 | | $2,107.86 |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 |
| 2 Semi Annual | | | | | 5468.7 | | $5,468.70 |
| 3 Semi Annual | | | | | $772.26 | | $772.26 |
| 4 Monthly | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 | $115,964.53 |
| 5 Monthly | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $108,000.00 |
| 6 Monthly | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $40,650.00 |
| 7 Semi Annual | | | $175,000.00 | | | | $175,000.00 |
| 8 | | | | | | | 0 |
| Totals | $36,460.76 | $36,460.76 | $211,460.76 | $36,460.76 | $44,809.58 | $36,460.76 | $454,824.53 |

## DK Aggregates, LLC
## Cash Flow Budget Worksheet
## Six Months Ended December 31, 2013

| | #25 | #26 | #27 | #28 | #29 | #30 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 869,915 | $950,454 | $1,030,993 | $936,532 | $1,017,072 | $1,089,262 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| **Available Cash Balance** | $1,094,915 | $1,175,454 | $1,255,993 | $1,161,532 | $1,242,072 | $1,314,262 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other:UST Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Subtotal** | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $648,000 |
| **Other Cash Out Flows:** | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 36,461 | 36,461 | 211,461 | 36,461 | 44,810 | 36,461 | 454,825 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | $36,461 | $36,461 | $211,461 | $36,461 | $44,810 | $36,461 | $454,825 |
| **Total Cash Outflows** | $144,461 | $144,461 | $319,461 | $144,461 | $152,810 | $144,461 | $1,102,825 |
| **Ending Cash Balance** | $950,454 | $1,030,993 | $936,532 | $1,017,072 | $1,089,262 | $1,169,801 | |

| Class | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | $2,107.86 | | $2,107.86 |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 |
| 2 Semi Annual | | | | | 5468.7 | | $5,468.70 |
| 3 Semi Annual | | | | | $772.26 | | $772.26 |
| 4 Monthly | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 | $115,964.53 |
| 5 Monthly | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $108,000.00 |
| 6 Monthly | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $40,650.00 |
| 7 Semi Annual | | | $175,000.00 | | | | $175,000.00 |
| 8 | | | | | | | 0 |
| Totals | $36,460.76 | $36,460.76 | $211,460.76 | $36,460.76 | $44,809.58 | $36,460.76 | $454,824.53 |

## DK Aggregates, LLC
## Cash Flow Budget Worksheet
### Six Months Ended June 30, 2014

| | #31 | #32 | #33 | #34 | #35 | #36 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 1,169,801 | $1,250,341 | $1,330,880 | $1,236,419 | $1,316,958 | $1,389,149 | |
| Cash Inflows (Income): | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| Available Cash Balance | $1,394,801 | $1,475,341 | $1,555,880 | $1,461,419 | $1,541,958 | $1,614,149 | |
| Cash Outflows (Expenses): | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other:UST Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Subtotal** | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $648,000 |
| Other Cash Out Flows: | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 36,461 | 36,461 | 211,461 | 36,461 | 44,810 | 36,461 | 454,825 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | $36,461 | $36,461 | $211,461 | $36,461 | $44,810 | $36,461 | $454,825 |
| **Total Cash Outflows** | $144,461 | $144,461 | $319,461 | $144,461 | $152,810 | $144,461 | $1,102,825 |
| Ending Cash Balance | $1,250,341 | $1,330,880 | $1,236,419 | $1,316,958 | $1,389,149 | $1,469,688 | |

| Class | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | $2,107.86 | | $2,107.86 |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 |
| 2 Semi Annual | | | | | 5468.7 | | $5,468.70 |
| 3 Semi Annual | | | | | $772.26 | | $772.26 |
| 4 Monthly | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 | $115,964.53 |
| 5 Monthly | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $108,000.00 |
| 6 Monthly | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $40,650.00 |
| 7 Semi Annual | | | $175,000.00 | | | | $175,000.00 |
| 8 | | | | | | | 0 |
| Totals | 36460.76 | $36,460.76 | $211,460.76 | $36,460.76 | $44,809.58 | $36,460.76 | $454,824.53 |

## DK Aggregates, LLC
## Cash Flow Budget Worksheet
## Six Months Ended December 31, 2014

| | #37 | #38 | #39 | #40 | #41 | #42 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 1,469,688 | $1,550,227 | $1,630,766 | $1,536,306 | $1,616,845 | $1,694,504 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| **Available Cash Balance** | $1,694,688 | $1,775,227 | $1,855,766 | $1,761,306 | $1,841,845 | $1,919,504 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other:UST Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Subtotal** | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $648,000 |
| **Other Cash Out Flows:** | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 36,461 | 36,461 | 211,461 | 36,461 | 39,341 | 36,461 | 449,356 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | $36,461 | $36,461 | $211,461 | $36,461 | $39,341 | $36,461 | $449,356 |
| **Total Cash Outflows** | $144,461 | $144,461 | $319,461 | $144,461 | $147,341 | $144,461 | $1,097,356 |
| **Ending Cash Balance** | $1,550,227 | $1,630,766 | $1,536,306 | $1,616,845 | $1,694,504 | $1,775,043 | |

| Class | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | $2,107.86 | | 2107.86 | |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 | |
| 2 Semi Annual | | | | | 772.26 | | 772.26 | |
| 3 Semi Annual | | | | | | | 0 | |
| 4 Monthly | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 | $115,964.53 | |
| 5 Monthly | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $108,000.00 | |
| 6 Monthly | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 | $40,650.00 | |
| 7 Semi Annual | | | $175,000.00 | | | | $175,000.00 | |
| 8 | | | | | | | 0 | |
| Totals | $36,460.76 | $36,460.76 | $211,460.76 | $36,460.76 | $39,340.88 | $36,460.76 | $ 449,355.83 | |

## DK Aggregates, LLC
## Cash Flow Budget Worksheet
### Six Months Ended June 30, 2015

| | #43 | #44 | #45 | #46 | #47 | #48 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 1,775,043 | $1,855,583 | $1,936,122 | $1,841,661 | $1,940,200 | $2,038,740 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| **Available Cash Balance** | $2,000,043 | $2,080,583 | $2,161,122 | $2,066,661 | $2,165,200 | $2,263,740 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other:UST Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Subtotal** | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $648,000 |
| **Other Cash Out Flows:** | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 36,461 | 36,461 | 211,461 | 18,461 | 18,461 | 18,461 | 406,026 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | $36,461 | $36,461 | $211,461 | $18,461 | $18,461 | $18,461 | $406,026 |
| **Total Cash Outflows** | $144,461 | $144,461 | $319,461 | $126,461 | $126,461 | $126,461 | $1,054,026 |
| **Ending Cash Balance** | $1,855,583 | $1,936,122 | $1,841,661 | $1,940,200 | $2,038,740 | $2,137,279 | |

| Class | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | | | 0 |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 |
| 2 Semi Annual | | | | | | | 0 |
| 3 Semi Annual | | | | | | | 0 |
| 4 Monthly | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 | $115,964.53 |
| 5 Monthly | $18,000.00 | $18,000.00 | $18,000.00 | | | | $54,000.00 |
| 6 Monthly | $6,775.00 | $6,775.00 | $6,775.00 | $6,775.00 # | $6,775.00 # | $6,775.00 | 54200 |
| 7 Semi Annual | | | $175,000.00 | | | | $175,000.00 |
| 8 | | | | | | | 0 |
| Totals | $36,460.76 | $36,460.76 | $211,460.76 | $18,460.76 | $18,460.76 | $18,460.76 | $  406,025.71 |

## DK Aggregates, LLC
## Cash Flow Budget Worksheet
## Six Months Ended December 31, 2015

| | #49 | #50 | #51 | #52 | #53 | #54 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 0 | $98,539 | $197,078 | $120,618 | $219,157 | $317,696 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| **Available Cash Balance** | $225,000 | $323,539 | $422,078 | $345,618 | $444,157 | $542,696 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other:UST Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Subtotal** | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $648,000 |
| **Other Cash Out Flows:** | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 18,461 | 18,461 | 193,461 | 18,461 | 18,461 | 18,461 | 372,351 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | $18,461 | $18,461 | $193,461 | $18,461 | $18,461 | $18,461 | $372,351 |
| **Total Cash Outflows** | $126,461 | $126,461 | $301,461 | $126,461 | $126,461 | $126,461 | $1,020,351 |
| **Ending Cash Balance** | $98,539 | $197,078 | $120,618 | $219,157 | $317,696 | $416,235 | |

Class

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | | | 0 |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 |
| 2 Semi Annual | | | | | | | 0 |
| 3 Semi Annual | | | | | | | 0 |
| 4 Monthly | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 | $115,964.53 |
| 5 Monthly | | | | | | | $0.00 |
| 6 Monthly | $6,775.00 # | $6,775.00 # | $6,775.00 # | $6,775.00 # | $6,775.00 # | $6,775.00 | $74,525.00 |
| 7 Semi Annual | | | $175,000.00 | | | | $175,000.00 |
| 8 | | | | | | | 0 |
| Totals | $18,460.76 | $18,460.76 | $193,460.76 | $18,460.76 | $18,460.76 | $18,460.76 | $ 372,350.71 |

Page 9

## DK Aggregates, LLC
### Cash Flow Budget Worksheet
### Six Months Ended June 30, 2016

| | #55 | #56 | #57 | #58 | #59 | #60 | Total |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 416,235 | $514,775 | $613,314 | $536,853 | $635,392 | $733,932 | |
| **Cash Inflows (Income):** | | | | | | | |
| Accts. Rec. Collections | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan Proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales & Receipts | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 1,350,000 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Total Cash Inflows** | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $1,350,000 |
| **Available Cash Balance** | $641,235 | $739,775 | $838,314 | $761,853 | $860,392 | $958,932 | |
| **Cash Outflows (Expenses):** | | | | | | | |
| Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Service Charges | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Delivery | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fuel | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| mgt | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Payroll | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| Payroll Taxes | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parts and Supplies | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Taxes & Licenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities & Telephone | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Other:Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other:UST Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | 0 |
| | | | | | | | 0 |
| **Subtotal** | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $108,000 | $648,000 |
| **Other Cash Out Flows:** | | | | | | | |
| Capital Improvements | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Note and Lease Payments | 18,461 | 18,461 | 193,461 | 18,461 | 18,461 | 18,461 | 372,351 |
| Owner's Draw | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other: | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | $18,461 | $18,461 | $193,461 | $18,461 | $18,461 | $18,461 | $372,351 |
| **Total Cash Outflows** | $126,461 | $126,461 | $301,461 | $126,461 | $126,461 | $126,461 | $1,020,351 |
| **Ending Cash Balance** | $514,775 | $613,314 | $536,853 | $635,392 | $733,932 | $832,471 | |

| Class | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Semi Annual | | | | | | | 0 |
| 2 Monthly | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $1,143.53 | $6,861.18 |
| 2 Semi Annual | | | | | | | 0 |
| 3 Semi Annual | | | | | | | 0 |
| 4 Monthly | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 # | $10,542.23 | $115,964.53 |
| 5 Monthly | | | | | | | $0.00 |
| 6 Monthly | $6,775.00 # | $6,775.00 # | $6,775.00 # | $6,775.00 # | $6,775.00 # | $6,775.00 | 74525 |
| 7 Semi Annual | | | $175,000.00 | | | | $175,000.00 |
| 8 | | | | | | | 0 |
| Totals | $18,460.76 | $18,460.76 | $193,460.76 | $18,460.76 | $18,460.76 | $18,460.76 | $ 372,350.71 |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

```
------------------------------------------------------------    x
In re                                                           :
                                                                :
DK AGGREGATES LLC                                               :        Chapter 11 Case No.
                                                                :        10-51823 (KMS)
        Debtors.                                                :
                                                                :
------------------------------------------------------------    x
```

## EXHIBIT 'C' TO DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

8:51 AM

02/22/11

Accrual Basis

# DK Aggregates, LLC
## Profit & Loss
### January through December 2010

|  | Jan - Dec 10 |
|---|---|
| **Ordinary Income/Expense** |  |
| **Income** |  |
| 4000 · Sales - Concrete Sand | 132,406.96 |
| 4005 · Sales - Fill Sand | 2,060,096.86 |
| 4010 · Sales - Mason Sand | 1,476.34 |
| 4015 · Sales - Sandy Clay | 11,647.33 |
| 4020 · Sales - Pea Gravel | 159,372.61 |
| 4025 · Sales - Wash Gravel | 948,571.40 |
| 4030 · Sales - Bedding Material | 5,849.53 |
| 4040 · Sales - Labor | 22,718.39 |
| 4050 · Sales - Hauling | 46,467.19 |
| **Total Income** | 3,388,606.61 |
| **Cost of Goods Sold** |  |
| 5000 · Purchases | 448.81 |
| 5001 · Cost of Goods Sold | 9,719.64 |
| 5010 · Wages | 366,303.70 |
| 5020 · Subcontractors |  |
| 5021 · Labor | 81,125.35 |
| 5022 · Hauling | 19,714.80 |
| 5020 · Subcontractors - Other | 342,280.16 |
| **Total 5020 · Subcontractors** | 443,120.31 |
| 5030 · Equipment Rental | 75,610.92 |
| 5040 · Fuel |  |
| 5041 · Oil/Hydraulic Oil/Grease | 25,437.70 |
| 5042 · Reimbursement | 2,236.30 |
| 5040 · Fuel - Other | 755,936.11 |
| **Total 5040 · Fuel** | 783,610.11 |
| 5055 · Job Materials | 133,032.07 |
| 5075 · Parts | 161,802.24 |
| 5080 · Payroll Taxes | 8,635.67 |
| 5090 · Per Diem | 288,578.23 |
| 5100 · Repairs & Maintenance | 15,997.67 |
| 5110 · Supplies | 480.44 |
| 5120 · Tools & Equipment | 3,610.15 |
| 5130 · Truck Expense |  |
| 5135 · Tires | 8,329.66 |
| 5130 · Truck Expense - Other | 8,191.78 |
| **Total 5130 · Truck Expense** | 16,521.44 |
| **Total COGS** | 2,307,471.40 |
| **Gross Profit** | 1,081,135.21 |
| **Expense** |  |
| Contract Labor | 1,882.16 |
| 6000 · Payroll Expenses | 63,498.96 |
| 6020 · Advertising | 468.66 |
| 6120 · Bank Service Charges |  |
| 6122 · Fees | 737.03 |
| 6123 · NSF/OD Fees | 429.00 |
| 6120 · Bank Service Charges - Other | 5,665.79 |
| **Total 6120 · Bank Service Charges** | 6,831.82 |
| 6140 · Contributions |  |
| 6141 · Donations | 400.00 |
| **Total 6140 · Contributions** | 400.00 |
| 6150 · Credit Card Charges | 4,100.00 |
| 6220 · Employee Benefits |  |
| 6221 · Mecical Bills | 4,877.30 |
| **Total 6220 · Employee Benefits** | 4,877.30 |

Page 1

8:51 AM

02/22/11

Accrual Basis

# DK Aggregates, LLC
## Profit & Loss
### January through December 2010

| | Jan - Dec 10 |
|---|---|
| 6250 · Insurance General | |
| 6251 · Automobile Insurance (DW) | 252.69 |
| 6252 · INLAND MARINE (DK) | 10,317.53 |
| 6253 · Insurance - Health | 39,004.21 |
| 6254 · GENERAL LIABILITY (DK) | 17,907.16 |
| 6255 · Insurance - Life | 10,670.42 |
| 6256 · WORKERS COMP | 10,005.96 |
| 6258 · Insurance Reimburstment | 1,389.41 |
| 6250 · Insurance General - Other | 15.00 |
| **Total 6250 · Insurance General** | **89,562.38** |
| 6270 · Legal & Accounting | 76,254.11 |
| 6275 · Licenses & Permits | 2,743.00 |
| 6277 · Meals & Entertainment | 14,150.49 |
| 6280 · Miscellaneous | 29,040.22 |
| 6300 · Office Expense | 4,577.03 |
| 6330 · Outside Services | 10,620.00 |
| 6335 · Penalties | |
| 6336 · Fines | 13,270.00 |
| **Total 6335 · Penalties** | **13,270.00** |
| 6340 · Postage Expense | 58.50 |
| 6350 · Professional Services | 15,688.00 |
| 6360 · Rent Expense | 74,073.70 |
| 6390 · Salaries - Office | 4,000.00 |
| 6400 · Salaries - Officer's | 1,000.00 |
| 6500 · Taxes | |
| 6501 · Tags | 7,427.56 |
| 6503 · Sales Tax | 8,744.73 |
| 6504 · Property | 22,634.89 |
| 6500 · Taxes - Other | 3,686.14 |
| **Total 6500 · Taxes** | **42,493.32** |
| 6520 · Telephone | 9,560.87 |
| 6550 · Utilities | |
| Cable Hwy 67 SHOP #149979-01-4 | 836.33 |
| Cable WORK TRAILER #156724-0 | 312.50 |
| Electricity #1820802 607 SHOP | 443.66 |
| Electricity #1820803 607 Plt #2 | 2,487.90 |
| Electricity #1820805 607 Plt #4 | 500.42 |
| Electricity #1820807 607 Plt #3 | 7,325.13 |
| Electricity #1820808 607 Pt S&G | 6,699.04 |
| Electricity #3717101 PLANT #1 | 2,050.26 |
| Electricity #3717102 607 Traile | 918.13 |
| Electricity #61201001 B/M Trail | 218.29 |
| Electricity #61201002 DW Office | 2,345.15 |
| Electricity #61201003 BJohn Pum | 59.47 |
| Electricity #61201005 FrJim Pmp | 203.56 |
| Electricity #61201006 DW Fuel P | 98.31 |
| Electricity #61201007 WRK TRL | 360.18 |
| Electricity #6586901 607 Office | 7,743.16 |
| Electricity#1820801  607 Tank | 22,665.80 |
| Sewer/Septic | 240.00 |
| Trash Disposal | 3,600.00 |
| 6559 · Water | 177.00 |
| 6550 · Utilities - Other | 154.24 |
| **Total 6550 · Utilities** | **59,438.53** |
| 6690 · Reconciliation Discrepancies | -13,000.00 |
| **Total Expense** | **515,589.05** |
| **Net Ordinary Income** | **565,546.16** |

8:51 AM

02/22/11

Accrual Basis

# DK Aggregates, LLC
# Profit & Loss
### January through December 2010

|  | Jan - Dec 10 |
|---|---|
| **Other Income/Expense** | |
| **Other Income** | |
| 7000 · Interest Income | 8,000.19 |
| 7010 · Other Income | 2,384.14 |
| **Total Other Income** | 10,384.33 |
| **Other Expense** | |
| 6260 · Interest | 82,940.98 |
| 7011 · Write Off | 0.01 |
| **Total Other Expense** | 82,940.99 |
| **Net Other Income** | -72,556.66 |
| **Net Income** | **492,989.50** |

8:51 AM

02/22/11

Accrual Basis

## DK Aggregates, LLC
## Balance Sheet
### As of December 31, 2010

|  | Dec 31, 10 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1090 · DK PEOPLES NEW OPERATING #73... | -58,331.52 |
| 1091 · DK PEOPLES NEW PAYROLL #7407 | -19,303.36 |
| 1092 · DK PEOPLES - NEW TAX ACCOUNT | 1,714.76 |
| **Total Checking/Savings** | -75,920.12 |
| **Accounts Receivable** | |
| 1100 · Accounts Receivable - Trade | 93,458.62 |
| **Total Accounts Receivable** | 93,458.62 |
| **Other Current Assets** | |
| 1210 · Inventory Asset | 1,500,000.00 |
| **Total Other Current Assets** | 1,500,000.00 |
| **Total Current Assets** | 1,517,538.50 |
| **Fixed Assets** | |
| 1500 · Property & Equipment | |
| 1550 · Land | 4,605,505.00 |
| 1570 · Equipment | 1,072,327.49 |
| 1580 · Machinery | 635,641.89 |
| 1590 · Office Equipment | 4,210.41 |
| **Total 1500 · Property & Equipment** | 6,317,684.79 |
| 1591 · Accum. Depreciation | -393,436.11 |
| **Total Fixed Assets** | 5,924,248.68 |
| **TOTAL ASSETS** | **7,441,787.18** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2000 · Accounts Payable | 36,076.30 |
| **Total Accounts Payable** | 36,076.30 |
| **Other Current Liabilities** | |
| loan | 100.00 |
| 2005 · Accounts Payable - Pre-Petition | 969,197.37 |
| 2050 · Accrued Taxes - Pre-Petition | 117,602.79 |
| 2190 · Sales Tax Payable | 5,271.76 |
| 2200 · Payroll Liabilities | -492.72 |
| 2225 · State Tax - MS | 3,853.00 |
| 2260 · State Unemployment - MS | 72.39 |
| **Total Other Current Liabilities** | 1,095,604.59 |
| **Total Current Liabilities** | 1,131,680.89 |
| **Long Term Liabilities** | |
| 2500 · Notes Payable - Secured | |
| Hncock Bk D.W.#71936 $27,257.05 | 300,000.00 |
| Hncock Bk DK #190835 $28,492.14 | 887,500.00 |
| Holliday Construction | 900,000.00 |
| Three Deuces, Inc. (Tinker) | 3,000,000.00 |
| **Total 2500 · Notes Payable - Secured** | 5,087,500.00 |

8:51 AM

02/22/11

Accrual Basis

# DK Aggregates, LLC
## Balance Sheet
### As of December 31, 2010

|  | Dec 31, 10 |
|---|---|
| **2510 · Notes Payable - Unsecured** |  |
| Dirtworks, Inc. | 414,213.05 |
| Hugh Nungesser | 92,788.75 |
| J.L. Holloway | 250,000.00 |
| Knights Marine & Industrial Ser | 191,947.00 |
| **Total 2510 · Notes Payable - Unsecured** | 948,948.80 |
|  |  |
| **Total Long Term Liabilities** | 6,036,448.80 |
|  |  |
| **Total Liabilities** | 7,168,129.69 |
| **Equity** |  |
| 3035 · Distributions | -1,600.00 |
| 3100 · Member Draws | -55,766.85 |
| 3200 · Member's Equity | -161,965.16 |
| Net Income | 492,989.50 |
| **Total Equity** | 273,657.49 |
|  |  |
| **TOTAL LIABILITIES & EQUITY** | 7,441,787.18 |